<i>New-Haven,</i><br/>June,<br/>1824.<br/><br/>Bradley<br/><i>v.</i><br/>Baldwin.

PETERS, BRAINARD and BRISTOL, Js. were of the same opinion.

> Record to be amended; and
> Judgment affirmed.

—◦◆◦—

## CAMP *against* CAMP and another.

Where the minister of an ecclesiastical society, coextensive with the town, in 1710, took possession of a piece of land, as a parsonage lot, under a vote of the town, passed in 1708; and he and his successor in the ministry occupied it as such, having the exclusive and uninterrupted possession, until 1762; it was held, that the society, at this time, had an incontrovertible title to such lot.

Though the law presumes the acceptance of a lease, executed and delivered for the use of the lessee, if it is beneficial to him; yet the question of benefit to the lessee is to be determined, not from the face of the instrument merely, but from the nature and circumstances of the entire transaction.

Where the lessor, at the time of making the lease, had no right, by deed, record or possession, and the lessee, at the same time, had a perfect title, by an exclusive and uninterrupted possession for more than fifteen years; it was held, that such lease was not beneficial to the lessee.

Therefore, where there was no direct evidence of acceptance, and no presumptive evidence, except what resulted from a lease made under such circumstances; it was held, that there was no evidence, on which the question of acceptance could be submitted to the jury.

Though the rule that a tenant is estopped to deny the title of his landlord, is an universal one, not merely technical, but founded in public convenience and sound policy; and though the person once a tenant, will, *prima facie*, be deemed to continue in that character, so long as he remains in the occupation of the land demised; yet it is competent for such person to shew, that the relation has been dissolved; and this being done, he will be permitted to controvert the title under which he formerly held.

Where a tenant at will, remained, after the death of the lessor, in the exclusive and uninterrupted possession of the land demised, claiming it as his own, for a period of fifty-seven years; it was held, that the jury were authorized to presume a restoration of the land to the heirs of the lessor, and then an actual ouster of them immediately after the death of the lessor, thereby dissolving the relation, which originally subsisted; and that, consequently, by virtue of such possession, the party acquired a perfect title.

*Middlesex,*
*July,*
*1824.*

Camp
*v.*
Camp.

This was an action of ejectment for a piece of land in *Dur-ham*, containing about six acres, usually called the *parsonage lot*. The cause was commenced in *March* 1821, and was tried at *Haddam, October* term, 1821, before *Peters*, J.

The possession of the defendants, as tenants of the ecclesiastical society in *Durham*, under a claim of right, being admitted, the plaintiff, an heir at law of *Hezekiah Talcott*, who died in 1764, gave in evidence a writing, purporting to be signed by him, of the following tenor : "*Durham, November* 4th, 1762. To whom it may concern, know, That I, *Hezekiah Talcott*, for a valuable consideration to my satisfaction received of the town, do let and release to the Rev. *Elizur Goodrich* my lot lying in *Durham*, bounded *East, West* and *North* on highway, containing about six acres [the demanded premises] for his use and improvement, during my natural life, and for the use and benefit of the ministry during my successor's good pleasure. *Hezekiah Talcott.*" The plaintiff also adduced evidence to prove the genuineness of the signature.

Gen. *James Wadsworth*, late of *Durham*, was town-clerk of that town, from 1755 to 1785, and died in *September*, 1817. In *July*, 1818, this writing was found among a quantity of papers, which, at his death, were contained in a desk, with deeds, an ancient record book of the town, and other writings, some pertaining to the town-clerk's office, and others of a different nature,—some being of value, and others of no value. Mr. *Goodrich*, at the time the writing bears date, was, and long before had been, in possession of the demanded premises, under the ecclesiastical society in *Durham*, called the congregational society. The society and the town of *Durham* were one corporation, from its first settlement, until 1804, when the society was organized according to the statute, (passed *May*, 1804. *tit.* 151. *c.* 4. ed. 1808.) with the same local limits as before.

The defendants gave in evidence a vote of the town of *Durham*, at a meeting held on the 16th of *February*, 1707—8, appearing on an ancient record book, and containing, among other things, the following provisions, *viz.* " First, the town by vote doth grant two allotments in every division of land herein granted, for the encouragement of the ministry ; and one of the said allotments the town, by vote, doth grant unto the minister, and his heirs forever, who shall be here settled in the gospel ; and the other allotment mentioned to be and remain of the ministry          town of *Durham* forever ; but only with this proviso, that if there should not, or so often as there

be no orthodox dispenser of the word resident here, that doth publicly dispense the same here in this town, that then the whole profit of said allotment shall be unto the town, and it is hereby reserved for the town" The defendants also gave evidence, that there were five divisions in the town, and a parsonage lot in each; but no other parsonage lot in this division than the one in question. They also shewed the ancient record of a deed, dated *February* 7th, 1709, of *Jehiel Hawley* to *John Stanley*, of six acres of land, bounded *Northerly* on parsonage land, *East* and *West* on highway; and the parsonage land mentioned in this deed, was admitted to be the land in question.

*Middlesex,*
July,
1824.

Camp
*v.*
Camp.

The Rev. *Nathaniel Chauncey,* the first minister of *Durham,* was settled there, *February* 7th, 1710; and in the same year, he took the demanded premises into his possession, as a parsonage lot, and held it, as such, until the time of his death, in 1754. The successor of Mr. *Chauncey,* was the Rev. *Elizur Goodrich.* The town, by their vote, *September* 7th, 1756, gave him a certain salary, and in the words of the vote, "the use and improvemeet of five lots, called parsonage land, in said *Durham.*" These terms he accepted; and entered upon such parsonage lots, including the one in question, and occupied them, until his death, in 1797. On the 10th of *June,* 1799, the town voted a certain salary to the Rev. *David Smith,* the present minister of the society, together with the parsonage lot in question. He accepted of the proposal; was settled there; took possession of this lot, and held it until the 20th of *June,* 1817; when he relinquished it to the society, on their making an addition to his salary, in lieu thereof. The society then took possession of the lot; and have occupied it, by their ministers and agents, from the settlement of Mr. *Chauncey* to the present time.

Upon these facts, the plaintiff claimed, that the judge ought to instruct the jury, that if they should find, that the writing executed by *Hezekiah Talcott,* was *accepted* by the town, the town and society must be presumed to have held the premises as tenants at will of *Talcott,* during his life, and as tenants at sufferance of his heirs, after his death, to the commencement of this suit; insisting, that such acceptance was in law to be presumed, because the writing was, on the face of it, beneficial to the town and society; and that if the writing was so accepted, it would be the duty of the jury to find a verdict for the plaintiff, whether he had title to the premises or not, because, by such acceptance, the town became the lessee of *Talcott,* and continued tenant at sufferance of the demanded premises, and

the defendants were thereby estopped, in this action, from denying the plaintiff's title, or setting up that of the society in opposition to it.

The defendants contended, that the vote of the town in 1707–8, and the other facts in the case, constituted a perfect title in the town, before the 4th of *November*, 1762, the date of the writing; that there was no evidence that *Talcott* ever had any colour of title; that the writing was not beneficial, but prejudicial, to the town, at the time of its date; that the acceptance of it, therefore, was not to be presumed, but must be proved, and there was no evidence from which the jury could lawfully find such acceptance; that if it was accepted, it expired two years after its date, by the death of *Talcott*, and could not estop the defendants, or the town or society, from denying *Talcott's* title, or setting up their own, in the action of disseisin; that the word "successors," used in the writing, was void, and made no tenancy at will, after the decease of *Talcott*; that a lease from *Talcott* to the town, could not pass a title from the town to *Talcott*, and as it could not operate as an estoppel, it could have no operation in the plaintiff's favour; that the long time which had elapsed since the expiration of the lease, was a good ground for the jury to presume a release or abandonment of *Talcott's* title, if he ever had any; and that from the facts of the case they ought to find an adverse possession of more than fifteen years, by which the society had a title against all people, and by which *Talcott* and his heirs would be barred: and the defendants prayed the judge to instruct the jury accordingly.

The judge instructed the jury, "That if the lease in question was executed by *Hezekiah Talcott*, and accepted by the society, it created between them the relation of landlord and tenant, called a tenancy at will, which was terminated, by the death of the parties; but this did not dissolve the relation of landlord and tenant; and the tenancy at will thereupon became a tenancy at sufferance, which continued until terminated, by an entry, or other act of the lessor or his heirs, or a surrender by the lessee, and precluded the tenant from denying the title of the landlord during its existence. But it was competent for the tenant, after the termination of this relation, to acquire a perfect title, by a new entry, and an adverse possession of fifteen years before the commencement of this suit. If you are satisfied, from the evidence given you in court, that this lease was executed by *Hezekiah Talcott*, and accepted by the society; and that the society, after the termination of their tenancy,

have not acquired a title, by fifteen years adverse possession; your verdict will be for the plaintiff; otherwise, for the defendants."

The jury returned a verdict for the plaintiff; and the defendants moved for a new trial, for a misdirection.

*Daggett* and *Sherman*, in support of the motion, contended,

1. That in 1762, the society represented by the defendants, had a perfect title to the land in question; having been in possession from the settlement of Mr. *Chauncey*, in 1710, to that time. During this period no pretence of title in any one else has been set up. The possession of the society will, *prima facie*, be deemed adverse.

2. That the society did not lose their title, in consequence of the lease made by *Talcott*, in 1762. First, this was a lease to Mr. *Goodrich* personally; and the society not being party to it, could not be affected by it. This point was settled in *Merwin & al.* v. *Camp & al.* 3 *Conn. Rep.* 35. Secondly, there was no fact in the case conducing, directly or indirectly, to prove an acceptance of the lease by the society. From the place where it was found, and the manner in which it was preserved, it is as reasonable to infer, that it was not, as that it was, accepted. Thirdly, an acceptance could not be presumed from the nature of the instrument; as it was not of course beneficial, but might be prejudicial, to the society. If the society already owned and were in possession of the land, *cui bono* take a lease of it? If a stranger were to offer you a lease of your own homestead, would you not spurn the offer? Could your acceptance of it be presumed, on the ground of its being for your benefit? Fourthly, the rule precluding a tenant from contesting his landlord's title, prevails only in *possessory* actions, and has never been recognized in any action, the grand object of which is, like our action of disseisin, to *settle the title*. *Adams on Eject.* 9. 294. 3 *Bla. Comm.* 191, 2, 3. 205. 1 *Swift's Dig.* 507.

3. That if this was a lease for the use and benefit of the society; and if it was accepted by the society, creating thereby the relation of landlord and tenant; and if the society, during the continuance of such relation, were estopped to deny the title of *Talcott*; still the estate created by the lease terminated on the death of the lessor in 1764, and the estoppel thereupon ceased. *Co. Litt.* 47. *b.* 62. *b.* The obstacles thrown in the way of the society's title, by the lease, were thus removed.

4. That if this were otherwise, still the heirs of *Talcott*, if ever, had a right of entry, on his death; and the subsequent possession by Dr. *Goodrich* and Mr. *Smith*, or by the society, without any acknowledgment of tenancy, or payment of rent, will be deemed adverse. If there has been an ouster at any time, it was *then*.

5. That by an adverse possession from that time until the commencement of the action, the society had acquired a perfect title.

*N. Smith* and *Staples*, contra, insisted, 1. That by virtue of *Talcott's* lease in 1762, the relation of landlord and tenant was created between him and the town or society. First, the town was the party beneficially interested in the lease. The consideration moved from the town. The object of the lease was to aid the minister in his support. Whatever was for the use and benefit of the ministry, was necessarily for the use and benefit of the town. This position is, moreover, conformable to the opinion of a majority of the Court, in *Merwin* & al. v. *Camp*; and is opposed only to a *dictum* of the Chief Justice in that case. Secondly, the acceptance of the lease, by the town, as a question of fact, was distinctly submitted to the jury, on the circumstantial evidence adduced by the plaintiff, and was found in his favour. The decision of the jury upon the weight and effect of the circumstances, is not a subject of revision here. Thirdly, the lease was, on the face of it, beneficial to the town; and an acceptance was, therefore, to be presumed.

2. That by virtue of the relation of landlord and tenant, the town was estopped, in this action, to controvert *Talcott's* title, while that relation subsisted. The existence of an established rule of law on this subject, is undisputed. The only enquiry, which it is necessary to pursue, is, whether it is a narrow rule, restricted to the fictitious proceedings in the *English* action of ejectment, or a broad one, founded on a general principle of law and sound policy, and capable of universal application. That the latter view of the subject, is the correct one, is demonstrable from an examination of the authorities. The principle is, that the tenant must, in all cases, give up to his landlord the possession he had from him; and it is immaterial what the form of action is. *Balls* v. *Westwood*, 2 *Campb*. 11., in which the rule was applied, was an action of *assumpsit*. It is applicable to an action for rent. *Vibbard* & al. v. *Johnson*, 19 *Johns. Rep.* 77. 79. The cases of *Jackson* d. *Low* & al. v. *Reynolds*, 1

*Caines* 444., *Jackson* d. *Klein* v. *Graham,* 3 *Caines* 188., *Jackson* d. *Anderson* & al. v. *M'Leod,* 12 *Johns. Rep.* 182., *Jackson* d. *Bleecker* v. *Whitford,* 2 *Caines* 215. and *Storrs* & al. v. *Barker,* 6 *Johns. Chan. Rep.* 166., shew the extent and general nature of the rule. It is true, that, for obvious reasons, most of the decisions have been had in actions of ejectment; but this action, even according to the *English* form, is not merely possessory: the *title* is investigated; and the plaintiff can recover only upon the strength of the title, which he shews. 3 *Bla. Comm.* 206. A judgment in ejectment, in which the rights of the parties have been once settled, is as complete a bar *in England,* as in this state.

3. That the relation of landlord and tenant, resulting originally from the lease, existed after the death of the lessor; the lessee continuing in possession. The estate created by the lease was, undoubtedly, determined, by that event; but this did not put an end to the relation: the party in possession was still a tenant at sufferance. *Jackson* d. *Anderson* & al. v. *McLeod,* 12 *Johns, Rep.* 182.

4. That the town did not acquire title, by adverse possession, after the death of *Talcott.* There could be no adverse possession, without a tortious ouster at its commencement. *Bul. N. P.* 104. *Brandt.* d *Walton* v. *Ogden,* 1 *Johns. Rep.* 156. In the first place, the law will not *presume* that a possession commenced wrongfully. Secondly, such presumption is repelled, in this case, by the continuing tenancy; that being as operative for this purpose, as to preclude a denial of the landlord's title. Thirdly, the question of ouster and adverse possession was distinctly submitted to the jury, and they have passed upon it. The defendants have nothing to complain of, in relation to this point.

HOSMER, Ch. J. In the action of disseisin before the court, the plaintiff claims title as being heir to *Hezekiah Talcott,* deceased; and the defendants claim to possess the premises demanded, as tenants of the ecclesiastical society in *Durham.* It is admitted, that at the commencement of the plaintiff's suit, the defendants were in possession under a claim of right; and this renders it necessary, only for the plaintiff to show, that he has title to the land in question.

The town of *Durham,* by the act of its incorporation, in the year 1708, became an ecclesiastical society; and has remained in existence, as such, to the present time. In 1804, it was re-

organized under the then existing law ; the legal effect of which, was not the creation of a new society, but the continuation of the old, with a diminution only of the number of the members, which belonged to it.   *Merwin* & al. *v. Camp* & al. 3 *Conn. Rep.* 35.

From the motion it appears, that the land demanded was considered as a parsonage lot, as early as the year 1708 ; and that from 1710 to the commencement of the plaintiff's suit, it has been in the exclusive and uninterrupted possession of the ecclesiastical society before-mentioned, either actually, or by the agents of the corporation.   No claim was advanced to the land until the 4th of *November*, 1762 ; when, as it is now contended, a lease was made of it to the Rev. Mr. *Goodrich*, and was accepted by the above corporation.

By a statute, passed in 1684, which has continued in existence ever since, it was enacted, that no person or persons should, at any time, make entry into any lands within this state, but within fifteen years next after his or their right or title should first descend or accrue to the same ; and in default of such entry, that such person or persons, or their heirs, should be utterly excluded and disenabled from such entry after to be made.   By the terms of the act, the right of entry only is barred ; but by invariable construction, an adverse possession of fifteen years extinguishes the title of the former owner, and vests a fee-simple estate in the person who has thus possessed. From the exclusive and uninterrupted possession of the ecclesiastical society, in 1708, to the date of the supposed lease, in *November*, 1762, *a period of fifty-four years*, it necessarily results, that at the time last-mentioned, their title to the premises was incontrovertible.

It is claimed by the plaintiff, that *Hezekiah Talcott*, who had never been in the occupation of the land demanded, nor had any right or title to the same, by deed or record, on the 4th day of *November*, 1762, made a lease of it, in the following terms : " I, *Hezekiah Talcott*, for a valuable consideration to my satisfaction received of the town, do let and release to the Rev. *Elizur Goodrich* my lot lying in *Durham*, bounded, &c., for his use and improvement, during my natural life, and for the use and benefit of the ministry, during my successor's good pleasure." That this was signed by *Talcott*, is admitted ; and likewise, that it was found in the month of *July*, 1818. among a number of papers in the desk of Gen. *James Wadsworth*, of *Durham*, sometime after his death.   It further appears, that

from 1755 to 1785, the said *Wadsworth* was town-clerk of the said town; and that in the desk before-mentioned, were deeds, and an antient book of records, and other writings, some pertaining to the town-clerk's office, and others of a different nature; some of value, and others of no value. When the supposed lease purports to bear date, it is conceded, that the Rev. Mr. *Goodrich* was the settled minister of the ecclesiastical society of *Durham.*

At the trial of the cause, there arose, upon the preceding facts, two general questions: First, whether the writing purporting to be a lease, was accepted by the ecclesiastical corporation beforementioned; and secondly, if it was accepted, what were the legal effects and consequences.

1. In respect of the first enquiry, the proof of acceptance is divisible into that which was direct, and that which was presumptive.

There exists no pretence, that any direct proof of acceptance was exhibited. The writing was not made with the knowledge of the ecclesiastical society, or with its assent, by vote, or in any other manner. With the town-clerk it was deposited, for some purpose; but whether to be delivered to Mr. *Goodrich,* on the performance of some precedent act, or the entering into some compact, beneficial to *Talcott;* or whether it was left with Gen. *Wadsworth* for the absolute use of the ecclesiastical society, the evidence furnishes no means of determining. The transaction is veiled in so much obscurity, as not to manifest the intention of the supposed lessor. If the writing was delivered, unqualifiedly, for the use of the ecclesiastical corporation, it has not been, and cannot be, pretended, that the town-clerk was the general agent of the corporation, or invested with authority to contract in its behalf. His powers are derived from the statute on this subject; and this makes him the recording officer of the corporation to enter the votes of the town, and to register deeds, births, marriages and deaths. It results, then, with the most irresistible certainty, that there was no direct evidence proving, or conducing to prove, that the lease was accepted by the ecclesiastical society.

As little ground is there for the assertion, that there is any presumptive evidence to this effect. Reference being had to the place in which the writing was deposited, the manner in which it was kept, and the person who had it in custody, it is an unwarrantable inference, that it was received for the unqualified use of the corporation. If it were not thus delivered by

*Talcott*, it is perfectly irrelevant, what legal presumption would arise, provided such delivery had existed. There must first have been a delivery of the writing for the corporation's use, before a presumptive assent, on their part, founded, as it necessarily must be, on such antecedent fact, can legally be deduced.

Admitting, however, the fact of such delivery, it would not, in my judgment, vary the case, in the minutest degree. It is not a correct assertion, that the acceptance of a lease is presumable, because, *on the face of it*, it appears to be beneficial to the lessee. On such principle, the title of any person to his property might be weakened, and subjected to doubt, at the election of any one, who should choose to assume the character of lessor. The presumption of assent is not founded on the face of an instrument, but in the nature and circumstances of the entire case ; and it is an indispensible enquiry, whether the person claimed to assent derives a benefit from the transaction. *Thompson* v. *Leach*, 2 *Vent.* 198. 206. *Mutton's* case, 2 *Leon.* 223. *Treadwell* & al. v. *Bulkley* & al. 4 *Day* 395. Now, upon the facts apparent on the motion, what possible advantage could the ecclesiastical corporation derive from the lease of *Talcott ?* It was the lease of a man who had no right, by deed, record or possession, and who, therefore, had nothing to convey ; and was made to those, who had, by an exclusive and uninterrupted possession of more than half a century, acquired an unquestionable title ; and who, therefore, had nothing to want. From such a lessor an accepted lease might be productive of injury, but could be of no possible benefit. The judge should have informed the jury, that on the point of acceptance there was no direct or presumptive proof of assent ; or, at least, the principles of law upon the subject should have been stated to them, that they might have been enabled to exercise their jurisdiction in an enlightened manner.

2. If the supposed lease was accepted by the ecclesiastical society, what were its effects and consequences ? For the purpose of the present argument, I shall consider the lease as if the society had been the lessee, by name. I am well aware, that the objection to this view of the subject is of great weight ; but as my opinion is not varied, by the above supposition, I rather choose to make it, than to enter into the discussion of an immaterial question.

It is an undoubted consequence arising from the relation of landlord and tenant, that the tenant is estopped from denying

the title of his landlord.    This is a universal rule, not merely technical, but founded in public convenience and policy.  *Hodson* & ux. v. *Sharpe* & al. 10 *East*, 350.    Whether the person in possession is tenant at will, at sufferance, or claiming under them, the legal consequence is precisely the same.    The person once a tenant, so long as he remains in the occupation of the land demised, must be deemed to continue in that character, unless he has surrendered the possession to his landlord; (*Jackson* d. *Bleecker* v. *Whitford*, 2 *Caines* 215.) or has solemnly renounced the tenancy, and commenced a fresh holding; (*Balls* v. *Westwood*, 2 *Campb.* 11.) or until he shows an actual disseisin or disclaimer on his part.    *Jackson* d. *Kane* & al. v. *Sternbergh*, 1 *Johns. Cas.* 153. 156.    In the forcible language of Lord *Redesdale*, " a person intrusted with the possession of property, shall not betray that possession."    The rule is founded in sound policy, because it tends to encourage honesty and good faith between landlord and tenant ; (*Lessee* of *Galloway* v. *Ogle*, 2 *Binney*, 468. 472.) and is intended to give the former a security, which, otherwise, would be infinitely endangered. While the protection of landlords is reasonably insured, by the rule before-mentioned, it has never been carried so far in disregard of the rights of the tenant, as to operate an absolute estoppel against his claim of title.    The object of it being accomplished, by the tenant's restoration of the possession to the landlord, or by any fact dissolving the relation between them, the rule above-mentioned is *functus officio ;* and the former tenant may controvert the title under which he held, without any embarrassment, except so far as a presumption may be derived from his implied recognition of such title.    Lessee of *Galloway* v. *Ogle*, 2 *Binney* 468. 471. *Jackson* d. *Anderson* v. *M'Leod*, 12 *Johns. Rep.* 182.    This I consider an undisputed point, and necessarily resulting from the general doctrine of estoppels, to which I shall presently recur.    He who denies this principle, must advance another equally repugnant to equity and common sense ; and that is, that a misapprehension relative to the title of a person, if accompanied with the reception of a lease from him, has the operation of a presumption *juris et de jure,* which may never be rebutted.

The lease from *Talcott* to Mr. *Goodrich* expired in the year 1764, on the death of the former.    It has not been contended, that an estate at will, after the termination of the estate for life, has been, or could be, created, by the lessor ; but it is admitted, that on the death of *Talcott*, there was a termination of

*Middlesex,*
July,
1824.

Camp
*v.*
Camp.

the estate arising from the lease.    This point, however, is perfectly immaterial; as whether the lessees were tenants at will or at sufferance, the heirs, in either case, had a right of entry on the land demised.    2 *Black. Comm..* 146. 150.    From the death of *Talcott* in 1764, to the year 1821, at which time the plaintiff's suit was commenced, *comprising a period of fifty-seven years*, the ecclesiastical society held the land in question adversely.    During more than half a century, they claimed their own, and had the sole and undisturbed possession of it, without the payment of rent, or any claim made on the part of *Talcott's* heirs, either of the land, or of the profits.    From the premises, the jury were authorized to presume a restoration of the land in question to the heirs of *Talcott*, and afterwards an actual ouster of them, by the ecclesiastical society; and to this effect they should have been instructed.

I am not acquainted with any decision, which contradicts the principle assumed.

The case that comes nearest to it, is that of *Lisle* v. *Harding*, determined in the *Common Pleas*, as far back as the year 1727.    *Bull. N. P.* 104.    It was said by the court, in this case, " If a cottage were built at first, by permission of the lord of a manor, or any acknowledgment of his title has since been made, (though it were an hundred years since,) the Stat. of *Jac.* 1. *c.* 16. will not run against him; for the possession of a tenant at will, for ever so many years, is no disseisin; there must be *a tortious ouster*."    I am inclined to think the court intended merely to assert this principle; that the possession of a person, *in the character* of a tenant at will, for any assignable lapse of time, constitutes no disseisin; and the reasoning of Lord *Mansfield*, in *Doe* d. *Fishar* & al. v. *Prosser, Cowp.* 217, confirms the opinion.    Undoubtedly, to enable the statute of limitations to run, there must be an actual disseisin; but the perception of the rents and profits of land, without accounting for, to any one, is evidence of an ouster.    In *Story* v. Lord *Windsor* & al. 2 *Atk.* 630. it was said, by Lord *Hardwicke*, that " in the case of a fine and non-claim, by one tenant in common, it will bar his companion, or him who claims a share, if he does not call the person buying to an account of the profits; *for this has always been admitted to be evidence of an actual ouster*."

In the case of *Doe* d. *Fishar* & al. v. *Prosser*, before alluded to, (which, on this subject, may be deemed a leading case) it was determined, that thirty-six years' sole and uninterrupted

*Middlesex,*
July,
1824.

Camp
*v.*
Camp.

possession, by one tenant in common, without any account to, or demand made, or claim set up, by his companion, is a sufficient ground for a jury to presume *an actual ouster* of the co-tenant. In delivering his opinion, it was said, by Lord *Mansfield :* " It is very true, I told the Jury, they were warranted, by length of time, in this case, to presume an adverse possession and ouster, by one of the tenants in common, of his companion ; and I continue still of the same opinion. Some ambiguity seems to have arisen from the term *actual ouster,* as if it meant some act accompanied by real force, and as if a turning out by the shoulders were necessary. But that is not so. A man may come in, by a rightful possession, and yet hold over *adversely,* without title. If he does, such holding over, *under* [*any*] *circumstances,* will be equivalent to an *actual ouster.* In the case of tenants in common, the possession of one tenant in common, *eo nomine,* as tenant in common, can never bar his companion ; because such possession is not adverse to the right of his companion, but in support of their common title ; and by paying him his share, he acknowledges him co-tenant. Nor, indeed, is a refusal to pay, *of itself,* sufficient, without denying his title. But if upon demand by the co-tenant of his moiety, the other denies to pay, and denies his title, saying, he claims the whole, and will not pay, and continues in possession ; such possession is adverse and ouster enough. The question, then, is, whether the possession in this case, after the death of *Stevens,* in the year 1734, *that is, after the particular estate ended,* was a possession as tenant in common *eo nomine,* or adverse ? It is a possession of near forty years, which is more than quadruple the time given by the statute for tenants in common to bring their action of account, if they think proper. But, in this case, *no evidence* whatever appears of *any account demanded, or of any payment of rents and profits, or of any claim by the lessors of the plaintiff, or of any acknowledgment of the title in them, or in those under whom they would now set up a right.* Therefore, I am clearly of opinion, as I was at the trial, *that an undisturbed and quiet possession, for such a length of time, is a sufficient ground for the jury to presume an actual ouster,* and that they did right in so doing." In the same case, it was said, by Justice *Aston :* " *What is adverse possession or ouster, if the uninterrupted receipt of the rents and profits without account, for near forty years, is not ?*" And by Justice *Ashhurst :* "After so long an acquaintance, I think the jury were well warranted *to presume any thing in support of the defendant's title ;* and

*Middlesex*,
July,
1824.

Camp
*v.*
Camp.

they might presume either an actual ouster, or a conveyance." To a determination equally luminous and forcible, I shall subjoin no observations.

The analogy between the above case and the one in question, is so direct, and the principle recognized so entirely applicable to both, that I shall not waste time, by any remarks on these subjects. From the premises it is indisputable, that the Judge should have told the jury, that they were warranted, from the length of possession, by the ecclesiastical society, without any claim made upon them, to presume *an actual ouster* of the heirs of *Talcott*.

It remains to enquire, if the plaintiff was actually ousted, by the corporation, and the relation of landlord and tenant was dissolved, what legal consequences result from the facts apparent on the motion.

The first consequence has, in some measure, been anticipated. The title, which the ecclesiastical corporation was invested with, at the date of the lease, remains in full force, except so far as it may be shaken, by the presumption resulting from the acceptance of that instrument. If a lease for life or years, is made, by deed poll, of lands wherein the lessor has nothing; this does not estop the lessee from averring, that the lessor had nothing in the lands at the date of the lease; and the same law is applicable to an indenture, which is the deed of both parties, with this difference only, that in the latter case, the estoppel operates until the determination of the estate. *Co. Litt.* 47. *b. Shep. Touch.* 53. 4 *Com. Dig.* 78. 4 *Bac. Ab.* 189. 190.

Upon the facts apparent on the motion, the relation of landlord and tenant having ceased, the ecclesiastical corporation have an indisputable title to the demanded premises.

The next consequence is, that the actual ouster being carried back to the period immediately subsequent to *Talcott's* death, in 1764, which, for aught I can perceive, is inevitable on the facts appearing, the ecclesiastical society have acquired title, if it did not before exist, by an adverse possession of more than fifteen years.

I am of opinion that there ought to be a new trial.

PETERS, BRAINARD and BRISTOL, Js. were of the same opinion.

New trial to be granted.