ABIGAIL HANFORD vs. HARVEY FITCH AND OTHERS.

The petitioner in 1820, then a married woman, joined with her husband in mortgaging for his debt a piece of land owned by her, soon after which she removed with her husband from the state, and they continued to reside out of the state until 1869, when he died. Immediately after the execution of the mortgage, C, a creditor of the husband, attached his life interest as tenant by the curtesy in the land, and afterwards had it set off to him in part satisfaction of the judgment which he obtained. In 1822 C purchased the mortgage interest, taking a quit-claim of the land from the mortgagee, and three months after he conveyed the land by a warranty deed to a purchaser, from whom by sundry conveyances the land came in different parcels to the respondents. The land was originally of little value, unfitted for cultivation or for building purposes, but the respondents had at great expense graded and erected houses and other buildings upon it. At the time C made the conveyance he was in actual possession of the land, but it did not appear when he took possession nor whether under his mortgage title or that derived from the levy of his execution. No interest upon the mortgage debt was ever paid by the petitioner or her husband, nor was any attention given by either of them to the property before his death. After his death the petitioner enquired about the property and demanded possession, which being refused she brought a bill in equity to redeem. Held—1. That if C was to be regarded as having taken possession under the levy of his execution the petitioner would not be barred by the statute of limitations. 2. But that, in the absence of any evidence on the subject, and after so great a lapse of time, the court would presume that he had abandoned his claim under the levy and had taken possession as mortgagee. 3. That his possession as mortgagee, and that of those deriving title from him, being adverse to the petitioner, she would be barred by the statute of limitations. (Two Judges dissenting.)

A married woman who executes a mortgage of her land with her husband, is not saved by her coverture from the running of the statute of limitations against her title in favor of the mortgagee.

BILL to redeem mortgaged premises and to remove a cloud from a title ; brought to the Superior Court in Fairfield County. The following facts were found by a committee :—

On the 14th day of June, 1812, the petitioner was married to one Zalmon Hanford, with whom she lived thereafter till his death, which took place March 15th, 1869. There was issue of the marriage born alive, and capable of inheriting the property hereinafter mentioned. Soon after the marriage they settled in Norwalk, in this state, where they continued to reside till some time during the year 1820.

On the 6th of May, 1818, the land in question, lying in Norwalk, containing about five acres, was conveyed to the petitioner by David and Silas C. Lockwood, who were the lawful owners of the same. The consideration for the conveyance was the sum of $550, which was paid out of the proceeds of a prior sale of real estate belonging to the petitioner, and which she had inherited from her mother.

On the 14th of March, 1820, Zalmon Hanford was indebted to Eli B. Bennett of Norwalk, by his promissory note of that date, in the sum of $224.08, payable on demand with interest, the consideration of which was dry goods, groceries and provisions, before that time sold by Bennett to Hanford, as supplies for his family ; and to secure the payment of the note, the petitioner and said Zalmon on that day executed and delivered to Bennett a mortgage of the land in question, which was on the same day recorded on the records of lands in Norwalk.

Very soon after the execution of the mortgage, the petitioner and her husband left Norwalk, and went to reside in the state of New York, where they lived about thirteen years, and then removed to Ohio, where they remained until about the year 1843, and then removed to the state of Illinois, where they resided till his death, and where the petitioner still resides.

Neither the petitioner nor her husband ever had any actual possession of the land after their removal from Norwalk, and Bennett never took possession. At the time of their removal it had been cultivated only to a limited extent, and no buildings had been erected upon it.

On the 14th of March, 1820, said Zalmon was indebted to one Samuel Cannon of Norwalk, by his promissory note for $100, which was executed and dated December 9th, 1815, and on said 14th of March, 1820, Cannon commenced a suit upon the note, by a writ of attachment, which was served by attaching all the right and interest of said Zalmon in the land in question; the attachment being subsequent to Bennett's mortgage. The writ was returnable to the County Court for Fairfield County at its April term, 1820, at which term Cannon recovered judgment by default against said Zalmon for $114.20 damages and $9.70 costs; on which judgment execution was taken out in due form, and on the 19th of August, 1820, levied on his interest in the land, which was appraised at $55.92, and the same was set off in favor of Cannon, in part satisfaction of the execution; and the execution, with the endorsement of the officer's doings thereon, was, on the 29th day of August, 1820, duly returned to court. There was no evidence before the committee that the execution was ever recorded by the clerk of the court, unless the same was to be implied from the facts found; and if, in the opinion of the court, the recording was to be inferred from the facts found, then the recording was found as a fact, otherwise not.

Cannon entered into possession of the land at some time between the levy of the execution and the 18th day of June, 1822, but the evidence did not enable the committee to fix the date of his taking possession, nor the title or claim of title under which he entered into possession, unless the same could be implied from the facts found. If the court should be of opinion that it might be presumed from the facts found that he took possession under his execution title, then the committee found such to be the fact, but otherwise no such fact was found.

On the 18th of March, 1822, said Bennett gave to Cannon a quit-claim deed of that date, of the land mortgaged to him by the petitioner and said Zalmon. The consideration paid by Cannon to Bennett for the deed was $244.81. The amount then due on the mortgage note was $251.11. Upon the payment of the consideration, the mortgage note was delivered to Cannon, with the quit-claim deed, but the mortgage was not delivered, and no other writing or assignment was made between Bennett and Cannon. At the time of this transaction nothing had been paid on the mortgage note, either upon the principal or as interest, and Bennett had not asked payment from Cannon, nor taken any steps towards collecting the note or the foreclosing of the mortgage. Cannon's intention and object in the transaction with Bennett was not to pay off and extinguish the mortgage, but to purchase and hold it as a subsisting incumbrance on the land.

On the 18th of June, 1822, by warranty deed of that date, Cannon conveyed all his interest in the land to one Samuel Gray, who entered into possession of the same. Gray occupied the premises until the 17th of January, 1824, when he purchased of one Marvin an additional tract of land, containing about one acre, adjoining the land in question on the south and west; and on the 27th of April, 1827, he conveyed the entire tract of land, as thus enlarged, by warranty deed of that date, to Esther Hubbell, of Norwalk, from whom the same has come through a large number of intermediate holders and possessors, and by numerous and an unbroken succession of deeds, mainly of warranty, and all duly recorded at or about the times of their respective dates, into the several possession and occupancy of the respondents; all of whom purchased and now hold their respective portions of the land under a bonâ fide claim of title. In so much of the land now occupied by the respondents, as was embraced in the original deed from David and Silas C. Lockwood to the petitioner, the respondents have no title, except such as they may derive through Cannon's deed to Gray, and the subsequent conveyances referred to, and such as they may derive from

the occupancy of the premises, under the facts and circumstances found.

No payment of interest or principal, or any part thereof, has ever been made on the mortgage debt, and there is no record or other evidence that the mortgage has ever been foreclosed. The question whether such foreclosure may be presumed from the lapse of time and the facts found, was submitted by the committee to the court.

After the deed from Cannon to Gray, of June 18th, 1822, no reference has ever been made in any of the subsequent deeds through which the respondents claim title, to the Bennett mortgage.

If the court should consider the Bennett mortgage as a still subsisting incumbrance on the land, then the committee found the amount due on the mortgage, computing interest to the 14th day of March, 1874, to be the sum of $950.09. The petitioner never requested a reconveyance of the legal title which passed by the mortgage, from any one, till the 6th day of October, 1870, when she requested the respondents severally to release to her, by suitable deeds, the legal title to the premises held by them respectively, which they severally refused to do.

The petitioner never asserted any claim of interest in the land until some time in the summer of 1869, and after the death of her husband, when she spoke of her having some interest in the same to her son-in-law in Chicago, with whom she was then living, and afterwards, during the same summer, she visited her nephew at Westport, Connecticut, and remained with him several weeks, and during this visit she rode with him to view the premises and pointed them out to him, which premises were then occupied with the buildings and improvements of the respondents. She then requested her nephew to ascertain the condition of the record title to the premises, but made no communication to any of the respondents; nor were any of the respondents in any way informed of her claim of an interest in the premises until they received notice from her present attorneys, in the fall of 1870, a very short time before the petition was served.

The several respondents purchased their respective interests in the premises, for full consideration, in good faith, without any notice or suspicion of any adverse claim or interest therein on the part of the petitioner, or of any person or persons. The records of lands, however, in the town of Norwalk, disclosed the state of the title to the premises, and such notice as the law implies from this fact the respondents had, but no actual notice.

Inquiry as to the condition of the title was made from time to time, by various purchasers of different portions of the premises. These inquiries were mainly addressed to John A. Weed, the town clerk of Norwalk, who held the office for many years, and was reputed to be thoroughly conversant with the condition of the land titles in the town. He invariably pronounced the title to the premises to be satisfactory and complete in every respect.

At the time of its purchase by Gray the land was very rough and barren, and poorly adapted to either agricultural or building purposes. Since that time the respondents, and various prior occupants, in good faith, without notice of any claim or interest on the part of the petitioner in the premises, and in the belief on their part that they held perfect titles to the fee of the land, have at great expense made many improvements on the land by grading, draining and enriching the soil, and by setting out trees and shrubbery, and have also erected four dwelling houses, with outbuildings and fences, which the respondents now occupy as their homesteads.

Upon these facts the case was reserved for the advice of this court.

*L. Warner* and *Woodward*, for the petitioner.

1. The petitioner was the legal and equitable owner of the land in question, subject to her husband's life estate, after her purchase in 1818. The respondents claim, in substance, that they have since acquired title by adverse possession, which we deny. Their possession was a lawful one, by virtue of the levy of the execution upon the life estate of the peti-

tioner's husband. The fact that it was not proved that the clerk of the court actually recorded the execution after its return, is of no consequence. It having been the duty of the clerk to make the record, in the absence of evidence to the contrary it will be presumed that he discharged his duty. *Booth* v. *Booth*, 7 Conn., 367 ; *Brownell* v. *Palmer*, 22 id., 119 ; *Sanford* v. *Sanford*, 28 id., 6. But if the execution title was defective, it characterizes, defines and explains their possession. *Taylor* v. *Public Hall Co.*, 35 Conn., 430 ; *Jackson* v. *Thomas*, 16 Johns., 301. They are now estopped from impeaching the title under which they claimed and held.

2. There being a right to the possession under a title not adverse, the law will presume the possession to have been under this title, rather than under an adverse claim. Angell on Limitations, § 385 ; *Codman* v. *Winslow*, 10 Mass., 151 ; *Proprietors of Kennebeck Purchase* v. *Springer*, 4 Mass., 418. Neither the respondents, nor those through whom they claim, have been in possession as mortgagees. The fact of possession is found, but not its character, except by implication from the facts found. The law will not imply adverse possession. 1 Swift Dig., 162 ; *Huntington* v. *Whaley*, 29 Conn., 391. The execution title existed in Cannon nearly two years before he got the mortgage title, and no one else being in possession, his possession will be presumed. *Noyes* v. *Stillman*, 24 Conn., 15 ; *Church* v. *Meeker*, 34 id., 421.

3. There was no mortgage outstanding. It was paid and satisfied. If Cannon intended, when he took the deed from Bennett, to hold the mortgage by assignment, and keep it outstanding, Bennett gave the deed for no such purpose, and Cannon, certainly, did not so intend when he conveyed to Gray, *not the debt, but the land*, by deed, with covenants of warranty. And of all the subsequent conveyances, mostly of warranty, not one referred to the debt or the mortgage as an outstanding claim. The husband was bound in equity to pay the mortgage debt, it being his own debt, and Cannon, in taking his interest, took it charged with the same equity. Willard's Eq., 649. The duty resting upon him to pay, the transaction between him and Bennett will be presumed to be

Hanford *v.* Fitch.

an extinguishment of the mortgage debt.    1 Washb. R. Prop., (3d ed.) 213 ; 2 id., 179.

4.   Upon the facts found, there could be no adverse possession until after the determination of the life estate.   *Mallory* v. *Hitchcock*, 29 Conn., 134 ; *Hyde* v. *Dallaway*, 2 Hare, 528.

5.   If the petitioner is bound to redeem, she is entitled to do so on payment of the whole or an equitable part of the mortgage debt, and this she offers to do if the court shall deem it necessary.

6.   The claim of the respondents that they acted in good faith, rests on no better foundation than their own laches, since the land records of the town disclosed all the defects in their title, and they are chargeable as well in equity as in law with notice.   *Booth* v. *Barnum*, 9 Conn., 286 ; *North* v. *Belden*, 13 id., 379.   Equity will not charge us with the consequences of their negligence.

*Smith*, with whom was *Beardsley*, for the respondents.

1.   If the mortgage has not already been redeemed, it cannot be done now—the equity of redemption being barred by the lapse of time.   *Jarvis* v. *Woodruff*, 22 Conn., 548.

2.   The mortgage has not been redeemed or extinguished. It is found that " Cannon's intention and object in the transaction with Bennett was not to pay off and extinguish the mortgage, but to purchase and hold the same as a subsisting incumbrance on the land."   Now the deed from Bennett to Cannon, and the transfer of the note, being the usual and proper means of effecting an assignment, Cannon's intention determines the effect of the transaction.   *Gibson* v. *Crehore*, 3 Pick., 482 ; *Hunt* v. *Hunt*, 14 id., 384.

3.   Cannon never had any title by his execution.   Under the law as it stood then, no title passed by the levy of an execution on real estate until it was actually recorded at full length in the office of the clerk of the court from which it issued.   This was not done here, and though it might be presumed for the purpose of quieting the possession, it certainly will not be done for the purpose of forcing upon a

man a title which he never claimed and thereby ousting a possession of half a century under another and superior title. Revision of 1808, p. 282; *Burton* v. *Pond*, 5 Day, 162; *Barney* v. *Cuttler*, 1 Root, 489.

4. Cannon never entered or claimed under this title. It was against his interest to do so, and there is no ground for a presumption that he did. He is not found to have entered the land before June 18th, 1822—the very day on which he conveys the land to Gray in fee with full covenants of warranty. And before this he had obtained from Bennett, on the 18th of March, 1822, the legal title to the fee, "with the intention of holding it." It was certainly not his interest to attempt to realize the $55.92, at which the life interest levied on was appraised, as it involved the risking of some $250 more on a precarious life estate, whereby he might at any day lose the whole interest and investment. He might more prudently buy the mortgage title to the whole fee, trusting to the chance of the mortgagors' neglect, inability, or unwillingness to redeem it. If it was so redeemed, Cannon could only lose the $55 already credited on his execution, and would gain in return a fair chance of getting the unsatisfied balance of $61. That Hanford was his debtor, did not deprive him of the right of buying this mortgage, which even any stranger had. *Gibson* v. *Crehore*, 5 Pick., 158; *Hunt* v. *Hunt*, 14 id., 384. These considerations render conclusive the reasonable presumption that Cannon did not enter and hold this land under an execution title to a life estate in it, but under the more comprehensive, beneficial, and secure title which he had to the whole fee.

5. As the petitioner could not, in the time of it, have forced an execution title upon Cannon, or compelled him to redeem her interest in the land from the incumbrance she had voluntarily placed on it, it is difficult to imagine how she can do it now, for, assuming for the sake of argument all she claims, she is chargeable with laches in her present application. For if the mortgage was satisfied, as she claims, yet the legal title to the fee was left outstanding in Cannon, and being unnecessary to an enjoyment of the life estate, an implied or result-

ing trust was raised in favor of Mrs. Hanford, the original owner of the fee, for its reconveyance. But her interests demanded seasonable action, for such trusts are barred by lapse of time, and the time begins when the trustee denies the trust. *Wilmerding* v. *Russ*, 33 Conn., 77; *Kane* v. *Bloodgood*, 7 John. Ch., 90, 123, 124; *Shaver* v. *Radley*, 4 id., 310, 315; *Farnam* v. *Brooks*, 9 Pick., 243, 246; Reeve's Dom. Rel., 31. The numerous deeds of warranty, beginning with Cannon's deed to Gray, the erection of homesteads at great expense on the land, and every circumstance connected with the occupation of the land, gave notice to the whole world that the occupants claimed and believed themselves to hold perfect and unquestioned titles. *Taylor* v. *Public Hall Co.*, 35 Conn., 437. Now, the petitioner having chosen to lie by till her alleged trustee has been dead many years; till it has become impossible, in the nature of things, to obtain the evidence which might sweep away every vestige of her alleged right, while innocent purchasers are at great expense making improvements on the land which she left " very poor and barren," no court of equity will now break the legal title to this land and bestow it on her, to the great loss and injury of the very parties whom she has deceived by her half century of treacherous silence. *Wendell* v. *Van Rensselaer*, 1 John. Ch., 353; *Higginbotham* v. *Burnet*, 5 id., 187; *Budington* v. *Munson*, 33 Conn., 481, 489; *Basset* v. *Nosworthy*, Rep. Temp. Finch, 102; 2 White & Tud. Lead. Cas. in Eq., 4.

6. To sustain the title under which the respondents and their grantors have held this land for fifty years, the court will presume all necessary deeds, conveyances and other evidence. *Bunce* v. *Wolcott*, 2 Conn., 37; *Giles* v. *Baremore*, 5 John. Ch., 550, 553.

7. But assuming that the petitioner has a right and is guilty of no laches, the respondents have an impregnable defence to her claim in the fact found by the committee, that they are " purchasers in good faith for valuable consideration and without notice of any adverse right or claim." *Bush* v. *Golden*, 17 Conn., 602. The respondents could not have had notice of a claim which the committee finds she never made

till after they purchased, and as to the right, assuming that the respondents before purchasing this land were bound to trace the record title back for half a century, (a doctrine which would suspend the sale of many tracts of land in Connecticut, where vagueness of description in deeds is the rule,) what notice was given by the record of the mortgage executed by the petitioner in 1820? Plainly, that in 1820 the land was conveyed in fee to Bennett by a sufficient deed, conditioned to be void on payment of a certain note. But it gave no notice that this note was ever paid, nor that any equity of redemption existed after the lapse of the fifteen years ending March 14, 1835, and there was no ground for such presumptions, nor was there anything in the state of the record to put them on inquiry. It disclosed an unbroken chain of title to the fee of the land. If there had been an extinguishment of the title created by this mortgage deed, that fact should have appeared in the records, and if the record did not show the true state of the title it was owing to the negligence of the petitioner. The respondents could fairly presume a foreclosure, release or abandonment of the equity of redemption, or its loss from the lapse of time. This alone was consistent with all the subsequent deeds on record, the nature of the occupation of the land, and the continued silence of the petitioner. *Jones* v. *Smith,* 1 Hare, 55; *State of Connecticut* v. *Bradish,* 14 Mass., 302.

PARK, C. J. The petitioner seeks, by force of a mere technical right, to recover the possession of premises which have become of great value by reason of improvements made upon them, while it is evident that she abandoned all her interest in them nearly fifty years ago. During all this period she has paid no interest on the note which the mortgage of her property was given to secure, nor has she looked after the property, or showed any interest in it. She has done nothing whatsoever indicating an intention ever to redeem the mortgage until recently, and it is manifest that her desire to do so now is wholly owing to the great advance of the property in value since the mortgage was given.

The claim of the petitioner is based upon the assumption that Cannon, the execution creditor, went into the actual possession of the life estate under and by virtue of the execution which was levied in his favor on the life estate of Zalmon Hanford, the late husband of the petitioner, and that both he and the parties claiming under him continued to hold possession of the land, under the execution levy, during the life of Zalmon Hanford. If this was so in fact, then the prayer of the petition should be granted.

But if such was not the case, if Cannon never took possession of the land under the levy of his exeution, but abandoned the interest he acquired by the levy, and some two years subsequently went into the actual possession of the land under the mortgage interest which he had purchased, and claimed the entire property as his own under such purchase, and possessed it accordingly, and this possession was continued by the parties claiming the land under him, then the right of the petitioner has long since been extinguished.

Whether the one state of facts or the other existed in this case, is the question we have to determine.

It appears in the case that for nearly half a century the land in question has been held by absolute deeds; that during this period it has passed from grantor to grantee through many conveyances, the grantor in nearly every instance warranting the title in fee to his immediate successor; that the parties to these conveyances purchased the land in good faith, without notice of any claim whatever to it on the part of the petitioner; that the land was barren originally, and was poorly adapted to agriculture; that it has been divided into building lots, and has been graded, drained and enriched at great expense; that trees and shrubbery have been set out and other improvements made upon it; and that dwelling houses, out buildings, and fences, have been erected upon it. Thus it appears that, during this long period of time, parties in possession of the land have constantly exercised acts of absolute ownership over it, and unless some unsurmountable obstacle prevents the running of the statute of limitations against the petitioner's claim, the case is one of the strongest

character going to show that the statute has long since extinguished her interest.

The only difficulty in the case arises from the fact that Cannon levied his execution on the life estate of Zalmon Hanford, and had it set off in part satisfaction of his debt, but whether he ever went into possession of the land under his levy, or claimed anything whatsoever from it, does not appear. It is found that he levied his execution, and there the finding leaves the matter. It is true that he was in possession of the land on the 18th day of June, 1822, nearly two years after the levy of his execution, but it is also true that three months previous to that time he purchased an outstanding mortgage on the entire property, and received a quit-claim deed of the same, which conveyed to him the legal title to the property. This accounts for his possession at that time, while there is an indication that his possession was under his quit-claim deed, in the fact that on that day he gave an absolute deed of the entire property, and warranted the title to his grantee.

There is nothing going to show any previous possession under the levy of the execution except the presumption of law that a party is in possession of land which he owns unless it appears to be in the actual possession of another. But this presumption has no reference to actual possession. It relates to constructive possession merely, and the rule was established for the benefit of the owner.

Nothing therefore appears in the case to show that Cannon ever in fact took or held possession of the land under his execution title, and the burden is on the petitioner to show that it was so held in order to avoid the running of the statute of limitations against her claims.

The life estate was of little or no value at the time of the levy of the execution, and there could have been but little object in keeping it alive. The land was barren, and poorly adapted to agriculture, and it is manifest that the life estate was not valuable for any other purpose. It required great expense to grade it for building purposes, and no man would think of incurring the expense necessarily attending the erection of

buildings on the land when it was held by so precarious a tenure. The life estate might terminate at any moment and valuable improvements consequently would be lost.

And furthermore, at the time that Cannon went into possession of the property under his mortgage interest, the entire property was not worth the amount of the mortgage, for he purchased it at less than the amount. The mortgage covered the entire property, and was the first incumbrance on it, and it is unreasonable to suppose that the owner of the mortgage would have sold it for less than the amount of the mortgage debt if the land was of greater value than the mortgage. It is therefore fair to presume that the life estate in the hands of Cannon was of no value when he went into possession of the land under his mortgage interest. This accounts for his not going into possession of the property under the levy of his execution. It accounts too for his conveying the property by a deed of warranty, for he considered his mortgage deed as equivalent to an absolute deed of the property, inasmuch as it represented its entire value.

We think therefore that the case shows that Cannon abandoned his levy for the benefit of the petitioner, and we may presume from the great length of time that the property has been held by parties in possession of the land, as absolute owners, that he quit-claimed to her all his interest acquired by the levy, and afterwards went into possession of the land under his mortgage deed. Similar presumptions are made in cases of landlord and tenant, where the tenant and parties claiming the land under him have for many years occupied the land as absolute owners. The law presumes in such cases that the tenant surrendered the tenancy to his landlord together with the possession of the property, and subsequently ousted him of the possession. It was so held by this court in the case of *Camp* v. *Camp*, 5 Conn., 291. In that case a tenant at will remained, after the death of the landlord, in the exclusive and uninterrupted possession of the land, claiming it as his own, for a period of fifty-seven years. It was held by the court, that although as a general rule a tenant is estopped to deny the title of his landlord, and although a per-

son once a tenant will, *primâ faciê*, be deemed to continue in that character so long as he remains in possession of the land demised, yet it is competent for such person to show that the relation has been dissolved. And it was further held that, from the long period of time that the property had been adversely held, the jury were authorized to presume a restoration of the land to the heirs of the lessor, and afterwards an ouster of them, thereby dissolving the relation which at first subsisted. The analogy of this case to the present one is apparent. There can be but little difference in principle, so far as the present question is concerned, between a tenant for life and a tenant for years. Acts of absolute ownership are as much inconsistent with the one as with the other, and if in the one case, where such acts have been long continued, the jury may be warranted in finding that the property had been surrendered to the landlord, and an ouster afterward committed, so may the presumption we have stated be warranted in the case at bar.

The Supreme Court of the United States, in the case of *Willison* v. *Walkins*, 3 Peters, 43, says :—" It is an undoubted principle of law fully recognized by this court, that a tenant cannot dispute the title of his landlord, by setting up a title either in himself or in a third person, during the existence of the lease or tenancy. . . The same principle applies to mortgagor and mortgagee, trustee and *cestui que trust*, and generally to all cases where one man obtains possession of real estate belonging to another by a recognition of his title. On all these subjects the law is too well settled to require illustration or reasoning or to admit of a doubt. But we do not think that in any of these relations it has been adopted to the extent contended for in this case, which presents a disclaimer by a tenant with the knowledge of his landlord, and an unbroken possession for such length of time that the act of limitation has run out four times before he has done any act to assert his right to the land. Had there been a formal lease for a term not then expired, the lessee forfeited it by this act of hostility; had it been a lease at will from year to year, he was entitled to no notice to quit before an

ejectment. The landlord's action would be as against a tres-
passer, as much so as if no relation had ever existed between
them." This case is a strong one on the point we are consid-
ering. The court say,—"Had there been a formal lease for
a term not then expired, the lessee forfeited it by this act of
hostility;" that is, the assumption of absolute ownership of
the property would forfeit a lease executed with all the forms
of law and cause the premises to revert to the landlord, who
might immediately treat his former tenant as a trespasser.

This case goes farther, perhaps, than our own courts would
be prepared to go. We should, probably, have applied to the
case the doctrine of *Camp* v. *Camp*, and have held that the
disclaimer, taken in connection with the adverse possession of
the premises, was sufficient to warrant the jury in finding a
surrender of the tenancy to the landlord and an ouster after-
wards. See also *Blight's Lessee* v. *Rochester*, 7 Wheat., 535 ;
Adams on Ejectment, 118 ; Buller's Nisi Prius, 96.

We think therefore that the life estate of Zalmon Hanford
terminated in the manner we have supposed when Cannon
went into possession of the land under his mortgage deed ;
and that consequently there was nothing afterwards to prevent
the running of the statute of limitations against the petition-
er's claim, for the law is well settled that a mortgagee may
hold land adversely so that his possession will eventually
ripen into an absolute title. *Bunce* v. *Wolcott*, 2 Conn., 27 ;
*Jarvis* v. *Woodruff*, 22 Conn., 548.

The conclusion we have come to in the case is clearly equit-
able. The petitioner had ample notice from the acts of the
parties holding the land, that they were not holding it under
the levy of the execution, but in their own right as absolute
owners, and for nearly fifty years she appears to have acquiesced
in the right and to have abandoned her equity of redemption.

In coming to the conclusion at which we have arrived, we
have not overlooked the fact that the petitioner, until the year
1869, was a married woman. If it were an ordinary case of
adverse possession of her land, her coverture would save her
from the application of the statute of limitations. But we
think that a wife who joins with her husband in a mortgage of

her land is not protected by her coverture from the ordinary effect of the adverse possession of the mortgagee. This adverse possession is not strictly against the legal title of the mortgagors; for, as between himself and them, he has the legal title, and they have as against him no right of entry to be barred; but the adverse possession is against the equitable right of the mortgagors to redeem, so that a court of equity in holding their right to redeem to be barred by the lapse of time, is merely applying an equitable limitation, in analogy to the statute of limitations at law, and we regard it as equitable that the wife, who has voluntarily placed herself in the position of a mortgagor, should be held to have accepted all the usual conditions and incidents of the position, and that her right to redeem is lost in equity when there has been such a lapse of time as would in equity bar the right of an ordinary mortgagor to redeem. We think too, that, in view of the tendency of our legislation as well as of the decisions of the courts throughout the country, to recognize the separate rights of married women with regard to their property, and their power to control the same, our courts should lean towards an enlargement of their responsibility and duty with regard to their property, and a curtailment of those exemptions and privileges that were given to married women as an offset for their want of power.

We advise the Superior Court to dismiss the petition.

In this opinion CARPENTER and PHELPS, Js., concurred, FOSTER and PARDEE, Js., dissented.