JOHN A. COLLINS and Others v. THOMAS COLLERAN and Others.[1]

May 9, 1902.

Nos. 13,074—(81).

## Adverse Possession of Real Property.

The quo animo a possession of real property is taken or held furnishes the true test of its character. The possession, to be adverse, must be shown to have been hostile in its inception, or that, having been begun in consistency with the rightful title, its character has changed; but there must be adequate cause for the change or for imputing it. When it commenced under acknowledgment of the right owner's estate, the possession will retain its original quality, and will be presumed to be in subservience to the rightful interest.

## Same—Father and Son.

Where the relationship of father and son exists between the parties, it is *held*, following O'Boyle v. McHugh, 66 Minn. 390, that the possession of the land of the one by the other is presumed to be permissive, and not adverse. To make such possession adverse, there must be some open assertion of hostile title other than mere possession, and knowledge thereof must be brought home to the one who owns the land. This doctrine is not affected by the fact that the occupant has paid all taxes for a number of years, has made valuable improvements, and apparently is exercising complete dominion over the property.

[1] Reported in 90 N. W. 364.

**Same—Conveyance in Fraud of Creditor.**

That the conveyance of the property by the one to the other was fraudulent as to a certain creditor of the grantor, and wholly without consideration, has no bearing upon a claim of title by adverse possession. Such a conveyance is valid as between the parties thereto, and the heirs of the grantor are in no better position to take advantage of the want of actual consideration of the fraud than was their ancestor when living.

**Adverse Possession of Grantor against Grantee.**

The grantor of real property, who has conveyed the legal title thereto in fraud of his creditors, remaining in possession himself, cannot again become the owner, and assert an adverse and hostile title against his grantee, based wholly upon a lapse of time. In such a case the presumption must be that the grantor intends that his possession shall be in subordination to the grantee's title, and this presumption remains until there is brought home to the grantee notice of a change of this intent by an express disclaimer of the presumed subordinate possession.

**Evidence.**

*Held,* in the case at bar, that the testimony was insufficient to sustain a finding of title by adverse possession to the land in controversy as against this appellant, who held the paper title.

Action in the district court for Houston county by John A. Collins and others, to establish an interest in certain land claimed to have descended to them and to defendants as the heirs of James Colleran, deceased. Defendant Thomas Colleran alone answered, claiming title under a conveyance from decedent. The case was tried before Kingsley, J., who dismissed the action as to plaintiff Collins and found that the remaining plaintiffs and defendants were seized of the title to the premises in equal shares. From an order denying a motion for a new trial, defendant Thomas Colleran appealed. Reversed.

*Duxbury & Duxbury,* for appellant.

*James O'Brien,* for respondents.

COLLINS, J.

The real purpose of this action was to determine the title to a farm consisting of one hundred sixty acres, which, according to the complaint, was owned in fee by James Colleran, the father of the plaintiffs and defendants, at the time of his death, intestate,

in 1900, and also to have the respective rights of the parties to said lands, as heirs at law of the deceased, ascertained and determined. Thomas Colleran was the actual defendant, and in his answer prayed judgment that he be declared the owner in fee of the tract of land, except as to such part theretofore deeded by him to his brother Michael, who also answered, but who has, so far as disclosed, been content to abide by the decision of the court below.

The facts found by the court, not now in dispute, are that the parties, plaintiffs and defendants, were the children and are the sole heirs at law of the deceased, James Colleran; that on January 19, 1881, he was the owner in fee simple and in possession of the land in dispute, and on that date, without any consideration therefor, made and delivered to his son, the defendant Thomas Colleran, his wife, Celia, joining therein, a deed of this land, conveying the legal title to him; that on February 22, following, James forged and signed the name of Thomas to a deed of that date, which deed purported to convey this tract of land to Celia Colleran, then the wife of James, and mother of Thomas, and, personating Thomas, acknowledged the execution of the same before a justice of the peace, and on May 12 caused both deeds to be recorded, paying the register's fees therefor. It was also found that at the time of the execution and delivery of the deed by James to Thomas an action was pending against the former for the recovery of money, and that this deed was made with the intent to hinder and delay the collection of any judgment which the plaintiff in that action might recover against James, and was a fraud upon said plaintiff, of which fact Thomas had due notice. None of the above findings are challenged by appellant's counsel.

The court further found that, notwithstanding the execution and delivery of the deed to Thomas and the forgery of the deed from him to his mother, Celia, James Colleran continued to reside upon said land, was in the exclusive possession and control of the same until his decease; that this possession was open, notorious, hostile, and adverse as to the whole world, and under a claim of title to the premises, and was continued for a term of more than fifteen years prior to his death. Based upon this finding, the conclusion of law was that James Colleran, at the time of his

death, was the owner in fee simple of the one hundred sixty acres. The court thereupon proceeded to award it in undivided shares to all the parties herein except Collins, who was declared to have no right, title, or interest in any part thereof. This appeal, taken by Thomas Colleran alone, is from an order denying his motion for a new trial, and the substantial question is, was the evidence sufficient to justify the finding of fact as to the adverse possession of James Colleran?

We are of the opinion, after careful examination and study of the record, that this finding was without sufficient evidence to support it. It is true that the deed to Thomas, the son, was without consideration and was intended to prevent the collection of a judgment which might be obtained against James in the pending litigation, and was therefore a fraud upon the plaintiff in that action, should he be successful. The testimony shows that James was living on the place at the time of the execution of the deed, and that Thomas, a young unmarried man, lived there with him when he was in the neighborhood. The latter was a laboring man, and worked out for different parties. The mother, Celia, lived a short distance away, upon another farm, and with her lived other children; but it does not appear that there was a formal separation of the father and mother. In 1881, soon after the recording of these deeds,—the genuine and the forged,—James and Celia executed and delivered a mortgage upon the farm to secure the payment of borrowed money used to settle the lawsuit before mentioned, and Thomas knew of this mortgage at the time. He worked in the state of Iowa during the summer of that year. After returning, in the fall, he lived with his father about three weeks, and then went to work in the pineries. In 1882 the farm was carried on by the father's tenant. In 1883 Thomas built a granary on the premises, built and repaired fences, and did more or less clearing out of stumps. In 1884 and 1885 he lived with his father on the land, and worked there; but it does not appear that there was any agreement between them as to a division of the crops. For the three subsequent years, 1886, 1887, and 1888, Thomas rented the farm from his father, paying a cash rent therefor. In 1886 he married, and thereafter resided upon rented farms

until 1890, when he bought the place upon which he has since lived, a short distance away. James paid the taxes each year, and seems to have exercised full and complete dominion over the land, except as indicated by the foregoing statements.

It was alleged in the answer of Thomas that his father's occupation of the farm was under an express agreement that he might live thereupon during the remainder of his life, but no attempt was made at the trial to show such an agreement. It is the contention of counsel, however, that all of the facts and circumstances tend to establish this allegation. We are unable to find in the record any testimony which tends to show in the slightest degree that James Colleran ever asserted or declared that he was not in possession under his son, and in subordination to his title, except as it might be inferred from the fact that he undertook by means of the forged deed to transfer the premises to his wife, Celia. But this act conclusively proves that up to and at this time he recognized the title to be in his son, and that his own rights were subordinate to this title. If anything is to be inferred from this act, of which Thomas had no knowledge, it is that James' possession was thereafter, so far as it evidenced his intent, subordinated to his wife's pretended title, and that for himself he claimed nothing adversely to her. No act of the father is shown, save the unlawful execution of the deed in his son's name, which suggested or amounted to a renouncement and a repudiation of possession under his son, or through which it can be gathered that the father claimed in hostility, open or concealed, to the son's title. That the father occupied the premises, exercised supreme dominion over them, and paid the taxes, does not indicate this hostility, or an intent to claim adversely. Nor does the bare fact, without something further, that the son rented from his father and carried on the farm as a tenant, nor the fact that Thomas did not object to the mortgage. All of these acts are easily reconciled with the presumption that the father was in possession in accordance with the legal title and under a claim that there was an agreement that the father was to occupy the premises during his life. The son's absence from the farm at times as a laborer, his renting of land after his marriage, and his purchase and occupation of a farm of

his own, are of no avail as proof of the father's adverse and hostile claim, for they are not his acts. These facts really serve to confirm the son's claim of an arrangement whereby the father was to have a life tenancy, for they are just what might be expected under such an arrangement. It is true that there was some testimony to the effect that in conversation Thomas recognized his father's ownership of the farm, but this consisted of loose remarks made and testified to by adversely interested brothers and sisters. These remarks were not definite, and cannot be given much weight. There is no evidence that Thomas was ever informed that his father asserted ownership. From the testimony, no one can point out when James first claimed that he was the owner of the farm after the conveyance in 1881, or when, or where, or how, he asserted adverse or other title in himself.

The rules of law which control this case seem to be well settled, and we simply have to apply them to the facts. James Colleran was in possession when he executed and delivered the deed, and he thereafter remained in possession. It was the legal presumption that the possession of the father was in accordance with, and in subordination to, the title conveyed to his son by the deed, and that such possession was under the grantee son, and with his acquiescence. This continued to be the presumption until the contrary appeared, or until an intention to claim the premises adversely was made manifest by some act of the grantor. Lowry v. Tilleny, 31 Minn. 500, 18 N. W. 452. See also Cameron v. Chicago, M. & St. P. Ry. Co., 60 Minn. 100, 61 N. W. 814; McCormick v. Herndon, 86 Wis. 449, 56 N. W. 1097. The true rule is thus stated in one of the leading text-books: "The quo animo a possession is taken or held furnishes the true test of its character. The possession, to be adverse, must be shown to have been hostile in its inception, or that, having been begun in consistency with the rightful title, its character has changed; but there must be adequate cause for the change, or for imputing it. Where it commences under acknowledgment of the right owner's estate, the possession will retain its original quality, through any succession of occupants of the land, and will be presumed to be in subservience to the rightful interest. The strictest proof of hostile incep-

tion of the possession is required." Tyler, Ej. 860. "It has been said, generally, that the grantor who continues in possession must make an 'explicit disclaimer' of subserviency to the grantee; that this disclaimer must be 'clear, unequivocal, and notorious'; and that his possession becomes adverse only upon a 'notorious assertion of right in himself.'" Horbach v. Boyd (Neb.) 89 N. W. 644, citing McCormick v. Herndon, supra; Sherman v. Kane, 86 N. Y. 57, 68.

Again, the parental and filial relations which existed between father and son must not be overlooked. In such cases the possession of the land of the one by the other is presumed to be permissive, and not adverse. This court has announced that, to make such possession adverse, there must be some open assertion of hostile title other than mere possession, and knowledge thereof must be brought home to the owner of the land. O'Boyle v. McHugh, 66 Minn. 390, 69 N. W. 37. The doctrine is not affected by the fact that the occupant has paid all taxes, made valuable improvements, and apparently is exercising complete dominion over the premises, for all this follows and is to be expected from the relationship. None of these propositions of law are in opposition to the doctrine asserted by respondents' counsel, namely, that a grantor with a warranty may, subsequent to the delivery of his grant, originate an adverse possession, and is not estopped from asserting the same by the covenant of warranty. But this doctrine is not applicable, because, on the record now before us, there is a total absence of testimony tending to show that James Colleran ever attempted to originate or assert an adverse possession or title in himself.

We have already noted that the court below made an express finding to the effect that the conveyance to Thomas was fraudulent as to a certain creditor, and we assume that it was given weight by the trial court when considering the sufficiency of the evidence. If so, the court was in error. That transaction was long before any claim of title by adverse possession could have been initiated, and had no bearing upon it. The conveyance was valid as between the parties thereto without regard to the payment of a money consideration, or the absence or presence of a fraudulent intent.

The heirs are in no better position to take advantage of the want of actual consideration or the fraud than was the fraudulent grantor when living. Wait, Fraud. Conv. § 121; Bump, Fraud. Conv. §§ 398, 402. It would be somewhat singular if a grantor of real property, who conveyed the legal title thereto in fraud of his creditors, remaining in possession himself, could again become the owner, and assert an adverse and hostile title against his grantee, based wholly upon a lapse of time. The intent at the time of such a conveyance is, necessarily, that the grantor's possession shall be in subordination to the grantee's title. That intent enters into the fraud, and the presumption must be that it remains until there is brought home to the grantee notice of a change of this intent by an express disclaimer of the presumed subservient possession. Williams v. Higgins, 69 Ala. 517.

Order reversed, and a new trial granted.