## GRANT ADAMS v. CHARLY G. JOHNSON AND OTHERS.

136 N. W. (2d) 78.

June 25, 1965—No. 39,639.

*Harold Jordan* and *Doherty, Rumble & Butler,* for appellants. *Brink & Sobolik,* for respondent.

FRANK T. GALLAGHER, C.

Appeal by defendants from a judgment of the district court declaring that plaintiff has acquired by adverse possession an undivided one-third interest in two separate quarter sections of land.

The history of these two parcels of land begins with Olaf Johnson, the patriarch of the family within which this dispute takes place. Olaf, a farmer in Kittson County around the turn of the century, had three sons by his first marriage, Charly, Oscar, and Leonard, before his first wife died in 1901. Oscar and Leonard changed their names from Johnson to Adams. Leonard is not involved in this case.

In 1904, Olaf married a second time. Two children, Russel and Minnie, were born of this marriage. In 1912, Olaf decided to move, with his wife and their children, from Kittson County to Mille Lacs County. Upon making this decision, Olaf also decided to give the family homestead in Kittson County to the three sons of his first marriage, who by this time were grown men and had moved out of that locality. The arrangement that was made in 1912 concerning this land did not become clear at the trial because the only two people available to testify were Albert Johnson (no relation to Olaf, but an old friend) and Oscar's wife. Neither of these witnesses had firsthand knowledge of any agreement. However, the essentials seem to have been that Olaf desired that at least one of those sons would farm the land, primarily because it was family property and because some family graves were located there. Therefore, one of the sons, Oscar, returned to the homestead, and on January 2, 1913, Olaf executed a warranty deed to his quarter section of section 8, Jupiter township, to the above-named sons.

Oscar lived on and farmed the land until his death in 1942, at which time his son Grant Adams, who had been assisting him, took sole possession and continued to operate the farm. Leonard never claimed an interest in the homestead and in 1948 gave a warranty deed to the section 8 land to Oscar's widow, Alma. Prior to this lawsuit, Alma transferred her interest to her son Grant, as did Ione, Grant's sister. Charly died in November 1913, leaving a widow, Lydia, and four children, Doris, Eleanor, Ruby, and Rudolph, all of whom are still living. As a result of the transfers by Leonard and Ione, Grant had a clear two-thirds interest in the section 8 land prior to this action.

The history of the quarter section of section 10, Jupiter township, varies somewhat from that of the section 8 land. After Olaf moved to Mille Lacs County, it became clear that he intended to have his Kittson County land go to the children of his first marriage and his Mille Lacs County property go to the children of his second marriage. However, at his death in 1932, he had not disposed in any way of his remaining Kittson County land in section 10. There-

fore, after his death, his second wife, Emma, executed a deed to that property to Lydia (Charly's widow), Oscar, and Leonard. Oscar, who had been farming the section 10 land since 1915 when Olaf's renter had left, continued to farm the land. Leonard and his wife also deeded their interest in the land to Grant, so Grant now has record title to an undivided two-thirds interest.

Although defendant Rudolph Johnson admitted that both he and his mother knew of Charly's and subsequently their interest in the section 8 land, he denied ever receiving notice of conveyance of the section 10 land in 1932 or having knowledge of their interests until 1962 when he checked the courthouse records. He admitted, however, that they had been aware of Olaf's ownership of the section 10 land at the time of his death in 1932.

From 1913 until this family conflict erupted in 1962, the Oscar Adams and the Charly Johnson families had affable but exceedingly infrequent social contacts. Rudolph visited the homestead three or four times; Lydia and one of her daughters only once. At no time was ownership of either the section 8 land or the section 10 land discussed.

During that same period, Oscar and his son Grant continued to farm the land and to pay all taxes. In the course of time, they made improvements on existing buildings and built new structures on the section 8 land; to wit, garages in 1924 and 1952, granary and shed in 1926, hog house in 1928, chicken house about 1945, a new barn in 1949, and a new house in 1960. They also tore down old buildings on the section 10 land, built and repaired fencing, and removed rocks from that land. Rudolph admitted knowledge of these improvements but denied knowledge of lesser improvements, such as wells, ponds, and removal of rock. He also checked the records in 1944 and discovered that Grant had been paying the taxes. Grant took commodity credit loans as sole owner of both properties, and he put the land into the soil bank under the same disclosure.

Apparently, it was the soil bank status of the lands that aroused Rudolph's curiosity. After checking the courthouse records in September 1962 and finding that the section 10 land apparently

belonged partially to his mother, he wrote a letter to Grant on September 12, 1962, informing him that he had checked on the property and demanding an accounting of the soil bank payments. Grant made no reply to this demand but instead commenced this action on January 7, 1963, claiming title by adverse possession against the heirs of Charly. Grant obtained judgment decreeing that he had acquired title by adverse possession to an undivided one-third interest in the lands involved, and this appeal was taken from the judgment.

Defendants contend that the trial court erred in ruling that plaintiff had acquired title by adverse possession against defendants to an interest in the lands in question.

■ The law applicable to this case is clear, well settled, and easily stated. Where one tenant in common enters and possesses land, his possession is regarded as possession by all the cotenants, not as a disseisin. Thus, there is a presumption that the cotenant holds lands with the implicit permission of the others even if the possessor should maintain the property as his own and keep the profits for himself. In order to overcome this presumption, not only must possession be open and notorious so that the owners may know of it, there must be an express or implicit ouster of them, such ouster consisting of acts or declarations of hostility sufficient to indicate a truly adverse possession and to start the statute of limitations[1] running. An express notice is not necessary; an intention to hold the land adversely to the owners may be derived from all the circumstances of the case, especially the amount and nature of control exercised by the cotenant over the property. American Law of Property, §§ 15.2 to 15.4; Annotation, 82 A. L. R. (2d) 5, 23.

Under the undisputed facts, there can be no doubt that Oscar's and Grant's possession of the property was actual, open, and notorious. They conducted farming operations for almost 50 years as sole owners, paying all taxes and insurance and retaining all profits. The surrounding neighbors and acquaintances considered them to be sole owners, and Rudolph and Lydia Johnson, on their rare visits, certainly were aware of the manner in which the property was being

---

[1]Minn. St. 541.02.

used. Defendants do not directly dispute that Oscar's and Grant's possession was open and notorious. The force of their argument on appeal is that they were never put on notice of an adverse, hostile holding of the land because no incident occurred that could be characterized as an ouster. While we are inclined to agree with this reading of the record, we do not think that an overt, explicit statement of claim is necessary before it can be said that the cotenants have been ousted from the premises. As we said in Beitz v. Buendiger, 144 Minn. 52, 54, 174 N. W. 440, 441:

"* * * Reference is made to language found in Collins v. Colleran, 86 Minn. 199, 90 N. W. 364, reiterated in the Omodt case, that to convert permissive possession into hostile possession the occupant 'must make an "explicit disclaimer" of subserviency * * * that this disclaimer must be "clear, unequivocal, and notorious"; and that his possession becomes adverse only upon a "notorious assertion of right in himself." ' But this does not mean that the assertion of adverse title must in such cases be expressly or affirmatively declared. It may be shown by circumstances."[2]

Our task on this appeal, then, is to determine whether there were circumstances upon which the trial court could base its finding that the possession of Oscar and Grant was hostile and thereby constituted adverse possession.

In a memorandum accompanying its findings, the trial court reasoned that the many improvements and repairs on the property constructed by Oscar and Grant were overt and unequivocal acts usually associated with exclusive ownership. It also indicated that the distant family relationship would not raise an inference of permissive occupation. Coupling these aspects, the court concluded that defendants had notice that possession was hostile, not permissive, and that the statute of limitations had run.

We hold that under the circumstances this was a permissible conclusion for the court to draw. Lydia Johnson visited the homestead

[2]See, also, Hoverson v. Hoverson, 216 Minn. 228, 12 N. W. (2d) 501; Lowry v. Tilleny, 31 Minn. 500, 18 N. W. 452.

once; Rudolph made short visits around 1926, 1942, 1949, and 1953. While they obviously observed the nature of plaintiff's occupancy at those times, no mention of ownership was ever made. Although Rudolph denied knowing of the grant of the section 10 land to Lydia, Oscar, and Leonard until 1962, we do not think that ignorance of ownership by a cotenant out of possession is necessarily conclusive against a finding of adverse possession by a cotenant in possession.[3] Moreover, Rudolph knew that his grandfather had owned land in section 10, and he was aware that this land might pass to him upon his grandfather's death if he then owned it. If Rudolph had been interested in ownership of that land as well as the section 8 land, he might have made a claim at any time after 1932, when Olaf, his grandfather, died. However, he did not do so, even though he knew that Oscar and Grant were openly occupying the land as if they were sole owners. They so occupied the property for almost 50 years. They should not now be penalized for failing to make an explicit claim to seemingly uninterested relatives when the obvious interpretation of their actions was that they were using the land for their sole benefit. If a certain point in time must be found along this continuing static situation, the statute began to run in 1942 at the time Rudolph visited the homestead for Oscar's funeral.

Not every undisturbed occupancy by a cotenant will result in a finding of ownership by adverse possession. But we think that finding is correct when the acts of ownership are overt and unambiguous and the relationship of the cotenants is such as not to raise an inference of permissive occupation. This is that type of case, as was Beitz v. Buendiger, *supra*. Hoverson v. Hoverson, 216 Minn. 228, 12 N. W. (2d) 501, where we affirmed the trial court's denial of ownership by adverse possession, can be distinguished on the ground that the cotenant in possession in that case himself denied any intent to disseise his cotenants.

Affirmed.

---

[3]See, Hanson v. Gallagher, 154 Iowa 192, 134 N. W. 421.