**Clara Dorothy GLOVER and Robert Douglass, Appellants,**

v.

**William Bruce GLOVER, Lucy Loy, Lona Stallsworth, Eleanor Buchanon, Lilly Beckett, Eva McCoy, George McCoy, Jr., and Carl Snyder, Sr., Appellees.**

No. S–10848.

Supreme Court of Alaska.

June 11, 2004.

Steven S. Tervooren, Hughes Thorsness Powell Huddleston & Bauman LLC, Anchorage, for Appellants.

Russell LaVigne, Jr., Alaska Legal Services Corporation, Kotzebue, for Appellee Carl Snyder, Sr.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

FABE, Justice.

## I. INTRODUCTION

In this quiet title action, the superior court found that Carl Snyder, Sr. held unrecorded title to a piece of property in Kotzebue that he and his family had lived on for close to fifty years. At trial Clara Glover and Robert Douglass claimed that Snyder held the property only as a lessee. Snyder maintained that his father and predecessor in interest, Dan Snyder, Sr., had gained title by adverse possession. Relying on a theory that neither party presented, the court found that the elder Snyder had gained title by adverse possession because the property changed hands, apparently inadvertently, for ten years. During this period, the court reasoned, Snyder met the requirements for adverse possession and took unrecorded title. We remand the case to the superior court so that it may conduct further factfinding and apply the proper test for determining whether and when a party's occupation of land meets the adverse possession requirements.

## II. FACTS AND PROCEEDINGS

### A. Factual History

Charting the course of this adverse possession controversy requires tracing the complex chain of title of two parcels of land in Kotzebue. They began as a single lot (Lot 9, Block 7, Tract A, Townsite of Kotzebue, U.S. Survey # 2863 A & B) that was owned by Mary Johnson in the early 1950s.

We attach as an appendix for ease of understanding an as-built survey of Lot 9 showing its partition into two lots and the structures that existed on it as of 1977. Lot 9 ran about 126 feet north to south and approximately 160 feet east to west.[1] Lot 9 fronted on two streets, Shore Avenue on the west and Kotzebue Way on the east, with 126 feet of frontage on each street. Eventually Lot 9 was divided into two parcels. The southerly parcel, having forty-six feet of frontage on each street, is the parcel with which we are primarily concerned. We refer to it in this opinion as the parties did below as the "subject lot."

Lot 9 was conveyed to Eva Glover, Mary Johnson's daughter, in 1956. In 1965 Eva Glover's successor in interest, Billy Glover, sold a portion of Lot 9 to Rotman Stores, Inc. According to the 1965 deed from Billy Glover to Rotman Stores, the parcel conveyed was the southerly eighty feet of Lot 9. Rotman Stores, in turn, sold the same parcel to Lawrence and Barbara Maxson on March 5, 1969. On May 19, 1975, the Maxsons by quitclaim deed transferred the subject lot— the southerly forty-six feet of Lot 9—back to Billy Glover. The quitclaim deed relates that this transaction was "for and in consideration of the exchange of a quitclaim deed for the northerly 80 feet of Lot 9." The record reflects that Billy Glover executed and delivered a deed to the northerly eighty feet of Lot 9 to the Maxsons on the same date that similarly recites that it is in exchange for the

deed to the southerly forty-six feet. With the exchange of the quitclaim deeds in May of 1975, Billy Glover owned the subject lot, which had assumed its present shape as shown in the appendix.

The appellants assert that what Billy Glover intended when he first sold part of Lot 9 to Rotman Stores was to sell the northerly portion and that the reference to the southerly portion in the 1965 deed was a mistake. The exchange of the quitclaim deeds and the placement of several buildings on the property may support this claim.[2]

On August 4, 1975, Billy Glover leased his interest in Lot 9 to NANA Housing Authority for twenty-five years subject to an automatic renewal of twenty-five years to aid in the construction of a HUD home. A HUD home was built in 1977 on the subject lot. It is marked "new home" on the as-built survey. When the HUD home was completed Billy Glover and his family moved from the structure marked "B" on the as-built survey into the new home.[3]

In 1953 or 1954, when Mary Johnson still owned Lot 9, Dan Snyder, Sr., built a house on it. The house is marked "A" on the as-built survey. In exchange for permission to live there, Dan Snyder, Sr. agreed to supply Johnson with game and other food. The superior court declined to find whether the arrangement was a lease or a sale. This gap in the findings is not challenged by either party. Dan Snyder, Sr. died in 1991 and his son, Carl Snyder, Sr. (Snyder) succeeded to his interest in the property. At various times, the Snyder family built a shed and an addition onto the house and for a period kept dogs on the property.

In 1994 appellant Clara Glover, Billy's daughter, prepared a written lease to formalize Snyder's occupancy; it was signed but Snyder denies its validity, claiming that his

---

1. The lot lines are not perfectly aligned with the points of the compass. The lines identified here as north-south actually run northeast-southwest. For clarity in the complicated history of the lot, we will refer to boundaries as if they matched the cardinal directions.

2. The evidence of mistake is not well developed. This may be because the trial court adopted a

theory not argued at trial that was based on the validity of the 1965 transaction. *See infra* page 391.

3. The Housing Authority lease was terminated in July 1987 when the Housing Authority quitclaimed its interest to Clara Glover.

daughter signed it without his authorization. The superior court resolved the factual conflict by crediting Snyder's testimony, and the appellants do not contest the finding on appeal.

## B. Procedural History

Clara Glover and Robert Douglass brought this quiet title action to clear the way for Glover to sell the subject lot to Douglass. Most of the original defendants were members of Glover's family who had a claim on the property through an administrator's deed, making them tenants in common following Billy Glover's death. Douglass and Glover settled with the relatives, leaving only the claim of Carl Snyder. Snyder answered the quiet title complaint by asserting as an affirmative defense that he held title to the land under his house and the shed his family built through adverse possession. Glover and Douglass moved for summary judgment. In response, Snyder asserted that his father had purchased the land from Mary Johnson, but did not rest his opposition to summary judgment on his claim of ownership. Instead, he argued that his father acquired title through adverse possession, independent of the agreement between his father and Mary Johnson. After the summary judgment motion was denied, a bench trial was held in June 2002.

The superior court first found that the agreement between Dan Snyder, Sr. and Mary Johnson rendered the Snyders' occupancy of the land permissive. Snyder therefore could not establish that his father gained title through adverse possession against Johnson or her successors. Although neither party argued the theory, the trial court went on to find that because Dan Snyder, Sr. had no similar agreement with Rotman Stores or the Maxsons, the permissive nature of the occupancy disappeared once Billy Glover sold the half of the parcel containing the Snyder house. Snyder's occupancy became hostile,

fulfilling the key requirement for establishing a claim of adverse possession. Ten years, the period required to obtain title by adverse possession under AS 09.10.030, passed between the transfer to Rotman Stores and the Maxsons' quitclaim deed returning the parcel to Billy Glover. The superior court therefore held that before the Glovers re-took record ownership of the parcel, Dan Snyder, Sr. had obtained unrecorded title to the portion that he occupied. Carl Snyder succeeded to this title on Dan's death. Glover and Douglass moved for amendment of findings and judgment or for a new trial, but the motion was denied. This appeal followed.

## III. STANDARD OF REVIEW

■■ The trial court's findings of fact are reviewed for clear error and are rejected "only if we are left with the definite and firm conviction on the entire record that a mistake has been committed."[4] This court reviews the trial court's conclusions of law using its independent judgment and adopts "the rule of law that is most persuasive in light of precedent, reason, and policy."[5]

Although they directly challenge the superior court's finding that Rotman Stores and the Maxsons owned the parcel under Snyder's house, the essence of Glover and Douglass's appeal is that the court erred in its conclusion that Dan Snyder, Sr.'s possession was hostile rather than permissive. We review the factual findings supporting this conclusion for clear error; the question of whether the facts as found by the superior court add up to hostility is a question of law to be reviewed with independent judgment.[6]

■ The superior court's decision to admit evidence is reviewed for abuse of discretion; reversal is warranted only when the reviewing court is "left with a definite and firm conviction, after reviewing the whole record, that the trial court erred in its ruling."[7]

---

4. *Vezey v. Green,* 35 P.3d 14, 19–20 (Alaska 2001) (quotation marks and citations omitted).

5. *Id.* at 20 (quotation marks and citations omitted).

6. *Cf. J.S. v. State,* 50 P.3d 388, 391 (Alaska 2002) ("Whether the factual findings are sufficient to satisfy the [CINA] rules is a question of law that we will review *de novo.*").

7. *Buster v. Gale,* 866 P.2d 837, 841 n. 9 (Alaska 1994) (quotation marks and citation omitted).

## IV. DISCUSSION

### A. The Superior Court's Findings Are Insufficient To Determine Whether Snyder or His Predecessor Acquired Title Through Adverse Possession.

Snyder claims that his father gained title through adverse possession under the previous version of AS 09.10.030, which was in effect at the pertinent times. It stated:

A person may not bring an action for the recovery of real property, or for the recovery of the possession of it unless the action is commenced within 10 years. An action may not be maintained for the recovery unless it appears that the plaintiff, an ancestor, a predecessor, or the grantor of the plaintiff was seized or possessed of the premises in question within 10 years before the commencement of the action.[8]

■ "In order to acquire title by adverse possession, [Snyder] must prove, by clear and convincing evidence, ... that for the statutory period his [father's] use of the land was continuous, open and notorious, exclusive and hostile to the true owner."[9] Glover and Douglass primarily argue that Dan Snyder, Sr.'s possession of the parcel was not hostile to Glover's interest. They do not directly contest the other requirements.

■ Hostile possession does not imply that the adverse possessor bore ill will or aggression toward the true owner; it only means that the adverse possessor held the land in such a way that his interest in the property was incompatible with the record owner's interest.[10] If the adverse possessor

holds the land as a tenant or otherwise with the record owner's permission, his claim "is subordinate to the title of the true owner" and is therefore not hostile.[11] If the adverse possessor, without the true owner's permission, "acted toward the land as if he owned it," then his claim is hostile.[12] "When one assumes possession of another's property, there is a presumption that he does so with the rightful owner's permission and in subordination to his title."[13] The adverse claimant thus bears the burden of proving that his claim is hostile.

■■ The superior court found that Dan Snyder, Sr. took possession of the land with Mary Johnson's permission. The court specifically declined to find whether the permissive arrangement was a sale or a lease. Snyder does not claim on appeal that he acquired title to the property by purchasing it from Mary Johnson, nor does he rely on the possibility that the transaction was a sale to bolster his adverse possession claim. For the purposes of this decision, we therefore interpret the arrangement as a lease, with the food he delivered serving as rent. The superior court went on to hold that the transfer of the property to Rotman Stores eliminated the permissive nature of his occupation because the new owner was not a party to the agreement that created it in the first place. But when possession begins with the true owner's permission, it cannot become hostile unless the presumption of permission "is rebutted 'by proof of a distinct and positive assertion of a right hostile to the owner of the property.'"[14] And a transfer does not

---

8. Alaska's other adverse possession statute, AS 09.45.052, applies only to possession under "color and claim of title," a claim Snyder does not press.

9. *Nome 2000 v. Fagerstrom*, 799 P.2d 304, 309 (Alaska 1990) (quoting *Smith v. Krebs*, 768 P.2d 124, 125 (Alaska 1989)); *see also Vezey*, 35 P.3d at 20.

10. *See Peters v. Juneau–Douglas Girl Scout Council*, 519 P.2d 826, 832 (Alaska 1974); *Chaplin v. Sanders*, 100 Wash.2d 853, 676 P.2d 431, 434 (1984) ("Hostility ... does not import enmity or ill-will, but rather imports that the claimant is in possession as owner, in contradistinction to holding in recognition of or subordination to the true owner.") (quotation marks omitted).

11. *See City of Anchorage v. Nesbett*, 530 P.2d 1324, 1328 (Alaska 1975).

12. *Smith*, 768 P.2d at 126.

13. *Ayers v. Day & Night Fuel Co.*, 451 P.2d 579, 581 (Alaska 1969).

14. *Nesbett*, 530 P.2d at 1328–29 (quoting *Ayers v. Day & Night Fuel Co.*, 451 P.2d 579, 581 (Alaska 1969)); *see also Hamerly v. Denton*, 359 P.2d 121, 126 (Alaska 1961); *Jackson v. Eichenberger*, 189 Neb. 777, 205 N.W.2d 349, 351 (1973); 10 *Thompson on Real Property* § 87.10, at 137 (David E. Thomas, ed., 2d ed.1998) ("If possession is permissive in the beginning, it can be changed to one of hostility only by the most unequivocal conduct on the part of the adverse claimant."); *see also id.* at n. 331 (listing cases).

alter the burden on the claimant[15] or the standard he must meet.[16] To show that his permissive occupation turned hostile, Snyder must prove that he made a distinct and positive assertion of his claim, regardless of whether the transfer to Rotman Stores was legitimate or was, as Glover and Douglass argue, a mistake that should be disregarded.[17]

Similarly, the fact that no rent was paid after 1982, at the latest, cannot defeat the permissive nature of the Snyder family's possession. Nonpayment of rent does not establish hostility.[18] The passive failure to make payments is not a "distinct and positive assertion" of ownership. If nonpayment terminated the lease, it only turned Snyder's interest in the land into a tenancy at sufferance. "An estate at sufferance is an interest in land which exists when a person who had a possessory interest in land by virtue of an effective conveyance, wrongfully continues in the possession of the land after the termination of such interest, but without asserting a claim to a superior title."[19] A tenancy at sufferance is a permissive interest and cannot be the basis for adverse possession.[20] Furthermore, we decline to establish a rule that gives tenants an incentive to stop paying rent in the hope of establishing an adverse possession claim.[21]

To become an adverse possessor, any tenant, including a tenant at sufferance, "must openly and explicitly disclaim and disavow any and all holding under his former landlord; and, furthermore, he must unreservedly and steadily assert that he himself is the owner of the true title."[22] This repudiation—a form of the distinct and positive assertion required to turn any permissive occupancy into a hostile one-must provide at least constructive notice to the landlord and true owner that the tenant has repudiated his leasehold interest and claims the land as his own.[23]

15. *Nesbett*, 530 P.2d at 1330 ("[T]he question of whether the use after conveyance was permissive or adverse is a question of fact on which [the adverse claimant] had the burden of proof.").

16. *Id.* (after conveyance, claimant must show "a distinct and positive assertion of a right hostile to the owner") (*quoting Scheller v. Pierce County*, 55 Wash. 298, 104 P. 277 (1909)).

17. Although Glover and Douglass are not technically seeking reformation of the Rotman Stores deed, their argument is closely analogous. Reformation "corrects the language [of a deed] so that it reads as it should have read all along." 14 RICHARD A. POWELL, POWELL ON REAL PROPERTY § 81A.07[3][a] (Michael Allan Wolf ed., 1999). By arguing that Rotman Stores and the Maxsons never owned the subject lot, Glover and Douglass ask the court to act as if Billy Glover sold Rotman Stores the northerly lot in the first place, rather than making the sale that the deed reflects. In other words, they want the deed from Glover to Rotman Stores to read as it should have read all along. A party seeking to reform a deed must prove the basis for reformation "by clear and convincing evidence." *Voss v. Brooks*, 907 P.2d 465, 468 (Alaska 1995). In the present situation, however, where the parties to the original transaction and their successors do not object to a change based on a mutual mistake and there is no evidence that any third party relied on the original deed, the heightened standard of proof is unnecessary.

18. *Jackson*, 205 N.W.2d at 351; *Worthen v. Rushing*, 228 Ark. 445, 307 S.W.2d 890, 892 (1957); *Jones v. Skannal*, 368 So.2d 774, 777

(La.App.1979); *accord Stepp v. Stepp*, 195 Ga. 595, 25 S.E.2d 6 (1943); *Ehrman v. Mayer*, 57 Md. 612, at 623 (1882) ("[W]hen the relation of landlord and tenant has been created, the possession of the tenant is consistent with the title of the landlord, and the *mere non-demand and non-payment of rent*, are not sufficient to bar the landlord's title...."); *Camp v. Camp*, 5 Conn. 291, at 301 (1824) ("The person once a tenant, so long as he remains in the occupation of the land demised, must be deemed to continue in that character....").

19. *Interior Energy Corp. v. Alaska Statebank*, 771 P.2d 1352, 1357 (Alaska 1989) (citing RESTATEMENT OF THE LAW OF PROPERTY § 22, at 53 (1936)).

20. In fact, "[a]t common law a tenancy at sufferance was ... a device to prevent the creation and running of adverse possession by the tenant holding over." *Kilbourne v. Forester*, 464 S.W.2d 770, 776 (Mo.App.1970).

21. *Accord Camp*, at 301 ("The rule is founded in sound policy, because it tends to encourage honesty and good faith between landlord and tenant; and is intended to give the former a security, which, otherwise, would be infinitely endangered.") (citation omitted).

22. *Nessley v. Ladd*, 29 Or. 354, 45 P. 904, 908 (1896).

23. *See Estate of Wells v. Estate of Smith*, 576 A.2d 707, 710 (D.C.1990); *Woodrow v. Henderson*, 783 S.W.2d 281, 285 (Tex.App.1989)

■ Some courts require only that the adverse claimant meet the usual requirements for adverse possession—as long as the claimant occupies the land openly and notoriously and acts as if he owns it, repudiation of the owner's superior claim may be inferred.[24] Other courts, generally reasoning in the analogous context of a tenant in common making an adverse claim against his co-tenant, have held that "a tenant ... does not, merely by exclusive possession, gain title by adverse possession."[25] Instead, "stronger evidence is required to prove such adverse possession than in similar claims by strangers to the title."[26] We adopt this view. Our case law makes clear that when a claimant started out occupying land permissively, it is essential that his new, hostile interest in the property be made clear to the true owner.[27] The behavior of a tenant and an owner will often be indistinguishable; if a tenant merely acts as he always did, the owner will not be on notice of his new, hostile claim. In almost every case, only a distinct and positive assertion of the new claim—or a repudiation of the owner's interest—will provide proper notice.

■■ An adverse claimant who entered land as a tenant must usually show some distinct act, like an open announcement of his claim or a change in his use of the land, sufficient to serve as a distinct and positive assertion of his claim to own the property.[28] This is more than is required of other adverse possessors, who may establish a claim simply by acting toward the land as if they owned it, without a particular assertion. Some cases, however, may require an exception to this heightened requirement. While "[n]ot every undisturbed occupancy by a [former tenant] will result in a finding of ownership by adverse possession[,] ... when the acts of ownership are overt and unambiguous"[29] and the exclusive possession is long held, a factfinder may infer that the tenant has repudiated his landlord's claim of ownership and asserted his own.[30] The long occupation, with its unambiguous hallmarks of ownership, serves as the distinct and positive assertion of the claimant's interest and the repudiation of the true owner's interest.

For example, in *Adams v. Johnson*,[31] the Supreme Court of Minnesota faced a claim by a joint tenant that he had gained full title to a piece of property, divesting his co-tenant of any interest. In general, establishing an adverse possession claim against a co-tenant requires the ouster of the co-tenant by the same sort of act required for the repudiation of a landlord's interest.[32] The claimant and his predecessor in interest had occupied the land "for almost 50 years as sole owners,

---

("Acts which are inconsistent with ownership by the record owner of the property may be sufficient to put the record owner on notice that the tenancy has been repudiated."); *McCall v. Hyde*, 39 Or.App. 531, 592 P.2d 1064, 1066 (1979). *But see Shepherd v. Lyle*, 395 P.2d 641, 644 (Okla.1964) ("[N]othing short of an explicit disclaimer of such a relation and a notorious assertion of right in himself will be sufficient to change the character of his [formerly permissive] possession.").

**24.** *E.g., Tex–Wis Co. v. Johnson*, 534 S.W.2d 895, 899 (Tex.1976) ("It is held that repudiation of the claim of a co-tenant and notice thereof may be shown by circumstances and that a jury may infer such facts from long continued possession of the land under claim of ownership and non-assertion of claim by the owners.") (citation omitted); *Reid v. Wilkerson*, 222 Ga. 282, 149 S.E.2d 700, 704 (1966). Others are more stringent in the other direction, holding that only a tenant who abandons the property and re-enters has asserted a claim hostile to the true owner's. *E.g., Arndt v. Ball*, 335 Mich. 595, 56 N.W.2d 394, 396 (1953).

**25.** *Johns v. Scobie*, 12 Cal.2d 618, 86 P.2d 820, 823 (1939); *see also Ransom v. Bebernitz*, 172 Vt. 423, 782 A.2d 1155, 1162 (2001).

**26.** *City of Providence v. Devine*, 58 R.I. 204, 192 A. 212, 214 (1937); *see also Hunter v. Schultz*, 240 Cal.App.2d 24, 49 Cal.Rptr. 315, 318 (1966).

**27.** *Nesbett*, 530 P.2d at 1330.

**28.** *See, e.g., Johns*, 86 P.2d at 823 (noting that tenant in common's construction of a house on disputed property may have been sufficient to oust co-tenants).

**29.** *Adams v. Johnson*, 271 Minn. 439, 136 N.W.2d 78, 82 (1965).

**30.** *See, e.g., id.; Watson v. Little*, 224 S.C. 359, 79 S.E.2d 384, 387 (1953); *Camp*, 5 Conn at 300–03 (*citing Fishar v. Prosser*, Cowp. 217, 98 Eng. Rep. 1052 (K.B.1774) (Mansfield, L.)).

**31.** 271 Minn. 439, 136 N.W.2d 78 (1965).

**32.** *Id.* at 81.

paying all taxes and insurance and retaining all profits."[33] They had also made many improvements to the property, putting up farm buildings and a house, and repairing fences.[34] Each of these acts was within their rights as tenants in common and could not on its own oust the co-tenant. But taken together, over the course of a half-century occupation whose character was fully understood by the co-tenant, they added up to an ouster.[35] It is important to note that such cases are "rare" and "extreme."[36] But the Minnesota case shows that this exception is important, as it preserves the possibility that those claimants who look the most like adverse possessors may acquire title. When former tenants who have spent undisturbed years acting as if they owned their land or home face a sudden, surprising challenge to their rights, equity demands that courts closely consider whether they have gained title through adverse possession, even without the overt act usually required.

█ The superior court's findings suggest that Snyder or his father may have made a distinct and positive assertion of their claim to the land, and a repudiation of the interest of Mary Johnson and her successors. The superior court found that Snyder built an addition onto the house, that his father kept dogs on the property, and that a fence was built "[a]t some time." If the fence, addition, or dog yard were beyond what Dan Snyder, Sr.'s agreement with Mary Johnson allowed, one or all of them may have demonstrated the family's repudiation of her successors' ownership of the land.

Snyder may have made a repudiation by words or conduct aimed directly at the true owner. The question of the legitimacy of the transfer to Rotman Stores would then become important because this type of repudiation could only be effective if it were made to the true owner. Alternatively, the repudiation may have been communicated to the community at large, as with an overt change in the use of the land. In this case, the identity of the true owner would not matter, because any record owner would be deemed to be on notice of it.[37] A third possibility is that the Snyders' occupation may have been long enough and their acts of ownership overt and unambiguous enough that the court could infer from their exclusive possession over the years that the family was repudiating the true owner's interest. In this scenario, the identity of the true owner would be similarly immaterial. We therefore remand the case to the superior court for the necessary findings. That court, at its discretion, may choose to review the existing record in light of these principles, or it may decide to take new evidence before making its determination.

### B. The Superior Court Properly Admitted the Testimony of Art Fields.

█ On remand, the superior court may again be faced with the question of whether to consider the testimony of Art Fields. Fields testified to the conversation between Mary Johnson and Dan Snyder in which they agreed that Snyder would live on Johnson's land and in exchange he would supply her with food. Glover and Douglass argue that the testimony should have been excluded both under Alaska Evidence Rule 602, which requires a lay witness to "ha[ve] personal knowledge of the matter" testified to,[38] and as inadmissible hearsay under Rules 801 and 802.

Fields testified that he was present for the conversation between Johnson and Dan Snyder:

THE COURT: Was Dan with you when ... you talked with Mary and you said I'll give you 110 [dollars] for half of the lot?

A: Yeah, and—and she said I'm going to give my other half to him for Native grub and stuff as long as he keep[s] supporting me....

---

33. *Id.*

34. *Id.* at 80.

35. *Id.* at 81–82.

36. *Watson,* 79 S.E.2d at 387.

37. "[W]hat a duly alert owner would have known the owner is charged with knowing." *Alaska Nat'l Bank v. Linck,* 559 P.2d 1049, 1053 (Alaska 1977) (quotation marks omitted).

38. Alaska R. Evid. 602.

Q: And do you believe that was exactly what she said?

A: Yeah.

Rule 602 requires only minimal evidence of a witness's personal knowledge.[39] Given the wide discretion accorded trial courts in their admissibility decisions,[40] we hold that the superior court did not abuse its discretion in holding that this testimony was sufficient to establish Fields's personal knowledge under Rule 602.

Fields recounted the conversation that he had with Dan Snyder, Sr. and Mary Johnson at several other points in his testimony. In addition to the passage reproduced above, the key testimony is:

> [T]his old lady, Mary Johnson ... came over and I—and Dan and I were there, Dan Snyder, and she said if you get me Native grub and take care of me for like caribou meat, reindeer meat, rabbits, anything, seal meat, I'll give you half of that property, and she sold half of it to me and gave the other to Dan Snyder.

 Glover and Douglass assert, without much elaboration, that this is hearsay and inadmissible. Under Alaska Rules of Evidence 801 and 802, evidence is inadmissible hearsay if it is a statement made out of court and introduced "to prove the truth of the matter asserted."[41] Fields's recounting of the conversation between Mary Johnson and Dan Snyder, Sr. is not excluded by the hearsay rule because it is not offered to prove the truth of the matter. The testimony is not relevant to prove that Johnson or Dan Snyder, Sr. actually intended to follow through on their promises, nor whether they performed them. It is relevant to prove that they *said* they would perform and therefore entered an agreement.[42] "Evidence of an oral agreement is not offered to prove the truth of the matter stated. Rather, such evidence is offered simply to show that the statement was made."[43] "If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay."[44] Fields's testimony was not hearsay and therefore properly admitted.

## V. CONCLUSION

Snyder may hold unrecorded title to the property in Kotzebue. If he or his predecessor repudiated the true owner's interest in the property through a distinct and positive assertion of their own claim of ownership or through a long and unambiguous occupation of the property, then the initially permissive possession became hostile. If he did so in time to fulfill the other requirements of adverse possession, then he has gained title through adverse possession. We REMAND the case to the superior court to review the record, including the testimony of Art Fields, and conduct further factfinding, if necessary, in order to determine whether such a repudiation occurred.

**39.** *L.C.H. v. T.S.*, 28 P.3d 915, 921 (Alaska 2001); *see also* Commentary to Alaska R. Evid. 602 ("As long as there is some evidence that the witness has personal knowledge, the court must let the [factfinder] decide whether or not the witness is really knowledgeable.").

**40.** *Buster*, 866 P.2d at 841 n. 9.

**41.** Alaska R. Evid. 801(c).

**42.** *Cf. Shimer v. Foley, Hoag & Eliot LLP*, 59 Mass.App.Ct. 302, 795 N.E.2d 599, 603–06 (2003).

**43.** *West Coast Truck Lines, Inc. v. Arcata Community Recycling Center, Inc.*, 846 F.2d 1239, 1246 n. 5 (9th Cir.1988); *see also United States Fidelity & Guar. Co. v. Davis*, 3 Ariz.App. 259, 413 P.2d 590, 592 (1966); *Shimer*, 795 N.E.2d at 603–06; *Island Directory Co., Inc. v. Iva's Kinimaka Enters., Inc.*, 10 Haw.App. 15, 859 P.2d 935, 939–40 (1993); 6 JOHN HENRY WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW § 1770, at 259 (James H. Chadbourne rev., 4th ed. 1976) ("Where the utterance of specific words is itself a part of the details of the issue under the substantive law and pleadings, their utterances may be proved without violation of the hearsay rule....").

**44.** Commentary to Alaska R. Evid 801(c).